**NAACP, et al., Plaintiffs,**

v.

**HARRIS, et al., Defendants.**

**Civ. A. No. 78–850–S.**

United States District Court,
D. Massachusetts.

April 27, 1983.

Edward J. Barshak, Sugarman, Rogers, Barshak & Cohen, Boston, Mass., for plaintiffs.

Nancy A. Serventi, Asst. U.S. Atty., Boston, Mass., for defendants.

## FINDINGS, RULINGS AND ORDER

SKINNER, District Judge.

In this action for injunctive and declaratory relief, the plaintiffs assert that the defendants, Secretary of the Department of Housing and Urban Development and the local administrators of the Department collectively (hereinafter referred to institutionally as "HUD") failed to take measures mandated by various statutes and the Constitution to prevent racial discrimination and promote fair housing in the administration of federal grants to the City of Boston ("the City"). The grants were of two types, Urban Development Action Grants ("UDAG") and Community Development Block Grants ("CDBG"). The claims of some of the individual plaintiffs with respect to UDAG grants were dismissed for lack of standing pursuant to remand from the Court of Appeals (reversing in part the order of this court dismissing all the UDAG claims). *NAACP v. Harris,* 607 F.2d 514 (1st Cir.1979). The motion to dismiss with respect to CDBG grants was denied by this court so that at the time of trial all the

plaintiffs remained in the case with respect to CDBG claims.

*Standing of Individual Plaintiffs.*

■ At trial no evidence was offered on behalf of any plaintiff except the National Association for the Advancement of Colored People, Boston Chapter ("NAACP"). No injury in fact having been established as to the individual plaintiffs, this action is dismissed with respect to all plaintiffs except the NAACP.

*Standing of NAACP.*

■ There was no evidence of specific injury in fact to any identified member of the NAACP. Evidence supporting the standing of the NAACP appears only in the testimony of the president of the local chapter, Joseph D. Feaster.[1] This testimony supports the following conclusions:

(1) The local chapter of the NAACP actively represents the interest of black people in metropolitan Boston, and it does not restrict its activities to its members. *See NAACP v. Button,* 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). The members, however, are a principal source of its funds through their dues, and are both black and white.

(2) The discriminatory administration by the City of UDAG and CDBG funds caused injury in fact to NAACP's member and nonmember constituency.

(3) The City's racial discrimination in housing and job opportunities was contrary to the goals of the NAACP and therefore interfered with the efforts of the NAACP to achieve racial justice, thus causing injury in fact to NAACP.

NAACP argues that it has both representative standing and standing in its own right to redress its own injury in fact. In *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982), the Supreme Court considered the independent standing of an organization called Housing Opportunities Made

Equal ("HOME"). The function of HOME was "to assist equal access to housing through counseling and other referral services". It alleged that its efforts had been frustrated by the defendant's activities. The Court ruled that HOME had standing in its own right:

Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests, see *Sierra Club v. Morton,* 405 U.S. [727] at 739 [92 S.Ct. 1361 at 1368, 31 L.Ed.2d 636] [1972]. *Id.*

The present case appears to me to fall within the rule of *Haven Realty,* and to be equally distinguishable from *Sierra Club v. Morton, See generally,* Chayes, *The Supreme Court 1981 Term—Forward: Public Law Litigation and the Burger Court,* 96 Harv.L.R. 4, 8–26 (1982).

In the absence of any contrary evidence, I have no reason to disbelieve Mr. Feaster's conclusion that the organization has suffered injury in fact. Accordingly, I find and rule that the NAACP has standing in its own right to pursue redress in this action.

A second basis for standing is the NAACP's status as a representative of black people in Boston, some of whom are its members.

[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

The NAACP clearly qualifies under (b), see *NAACP v. Button, supra,* and where

---

1. Although Mr. Feaster's testimony was conclusory and unspecific, and often the fruit of some egregiously leading questions, it must be

considered like any other in the absence of proper and timely objections.

only declaratory and injunctive relief are sought, it qualifies under (c). Mr. Feaster testified that the discriminatory action by the City has adversely affected the members of the NAACP, who would have had standing to sue in their own right. He cites no names, places, dates or other supporting testimony. Mr. Feaster did not distinguish between injury in fact to members with respect to UDAG grants and injury in fact to members with respect to CDBG grants.

Failure to condition CDBG grants to improve the lot of black people generally is likely to affect all black people in the City, including the black members of the NAACP. Plaintiff's complaint about UDAG funds, however, has centered primarily on the failure to provide low-income housing for minorities. I can make no assumption as to whether members of NAACP are included among the specific segment of the population which qualifies for low-income housing. It is clear, however, that this segment of the population includes a large proportion of black people living within the area served by the plaintiff.

█ In view of the actual holding in *Hunt v. Washington Apple Advertising Commission, supra,* I am persuaded that injury in fact to an actual formal membership is not an essential element of representational standing. The Washington Apple Advertising Commission is actually a state agency and the apple growers who suffered the alleged injury in fact were accurately described as its "constituency", since it obviously was not a membership organization. The NAACP's membership is in fact different from its constituency. Its membership consists of both white and black people, and is the principal source of its funds. Its constituency, however, according to Feaster, consists of all the black people in metropolitan Boston. It does not purport to directly represent the interests of its white members. *Hunt* would appear to permit standing to be based on injury in fact to a defined and discrete constituency. I recognize that *Hunt* can be distinguished on the ground that the apple growers possessed the "indicia of membership in an organization". They elected the members of the Commission from among themselves and financed its activities through assessments. The nonmember constituency of the NAACP does not possess these indicia. Nevertheless, the Court has relaxed the requirement of formal membership, and I conclude that it is both reasonable and sound policy to recognize the historic role of the NAACP as an appropriate representative of black people within the jurisdiction of the local chapter. *See NAACP v. Button, supra;* Chayes, *op. cit.*

## FINDINGS OF FACT ON THE MERITS

Racial segregation and racial discrimination in public and private housing prevailed in all sections of Boston throughout the period 1977 to the present. The black population of the City increased from 22% to 30% between 1970 and 1980 and that the black population consisted of a larger proportion of families with children than occurred among the white population. The housing stock available to low-income families with children has decreased during the same period, and the vacancy rate in low-income housing at the time of trial was only 3.7%. Part of the decrease has been caused by the condemnation of approximately 4,000 units of public housing administered by the Boston Housing Authority as a result of bad maintenance, bad management and vandalism by tenants. Other loss of low-income housing has occurred through the rehabilitation and "gentrification" of previously marginal housing, which in its rehabilitated form is affordable only by middle- and upper-income people, most of whom are white.

There is a housing emergency in Boston.

White and black households in need of housing assistance substantially differ in several respects: whereas among whites 74% are renters and 26% are owners, among blacks 92% are renters and 8% are owners; additionally, while 44% of white renter households are elderly and 56% are families (i.e., households with children), only 26% of black renter household are elderly and 74%

are family. The median income of white families is substantially higher than the median of black families. Thus, black households are more likely than white to be renters, family, and low income. The neighborhoods of Boston have traditionally been racially and ethnically discrete. The black population is centered in Roxbury, South Roxbury, Dorchester and parts of Mattapan. South Boston, East Boston, Charlestown, the North End of Boston, Bay Village, Beacon Hill and most of the Back Bay are predominantly white neighborhoods, though segregated by ethnic background. Racial violence is common and both blacks and whites are afraid to live, work or travel in certain areas of the city thought to be "the turf" of the other race.[2] These fears are justified. There are some areas of the city in which the racial population is mixed, namely, Mission Hill, Brighton-Allston and certain sections of Roslindale, Hyde Park and parts of Dorchester, Mattapan and the South End.

The population of public housing projects follows the racial characteristics of the neighborhoods in which the projects are located. Most of the projects designed for low-income families are in black neighborhoods. Most of the projects in white neighborhoods are designed for the elderly.

Blacks in predominantly black neighborhoods have not evidenced to HUD officials any interest in moving into the lower income white neighborhoods of the City. They have expressed a preference for moving to the suburbs and HUD has attempted to provide housing in surrounding communities. I find, however, that this preference is at least in part the result of the lack of safe, desegregated housing in white neighborhoods.

Enforcement of laws prohibiting racial discrimination in housing has been on the basis of complaints only, and the City has not established any mechanism for overall monitoring of fair housing practices.

Racial discrimination in hiring had been judicially found to exist in the City's police and fire departments, deliberate racial segregation had been judicially found to exist in the City's schools, and historical segregation had been judicially found to exist in the facilities administered by the Boston Housing Authority.

All of the above facts were well known to the officials of HUD responsible for Boston CDBG and UDAG programs from 1977 to the present time. HUD's administrative record for fiscal years 1977 through 1981 indicate that these facts were discussed by HUD officials and decisions made with reference to them.

HUD funded CDBG programs from 1977 to the present without having received from the City any special assessment of minority housing needs. It was not until 1981 that HUD required the City to prepare such an assessment. As of the time of trial, no such assessment had been submitted.

HUD required the City to establish a fair housing office, but there was no evidence of any substantive results.

HUD required the City to pass a fair housing ordinance in 1981, and indeed withheld CDBG funds for nearly a year until an ordinance was finally passed. The enforcements provisions, however, remain ineffective until passage of enabling legislation by the General Court. There was no evidence of any continuing effort to secure such legislation.

HUD has required the City to establish a special community disorders unit in the Boston Police Department and funded this unit to the extent of $37,000. There was no evidence, other than unsupported opinion, to support the plaintiff's assertion that the funding is inadequate, unless I could draw an inference that it is by taking judicial notice that racially related violence persists. Such an inference would depend upon competent evidence of a direct relationship between investment and result. No such evidence was offered and the proposition is not

---

2. Evidence on this point was limited to the fears of blacks. I take judicial notice of the other side of the coin.

so self-evident as to be a proper subject of judicial notice.

The plaintiff alleges that HUD has supported various City programs designed to provide financial aid to home owners which were administered in such a way as to have a discriminatory impact adverse to minorities. These programs are the Housing Improvement Program ("HIP"), its successor, the Housing Rehabilitation Program ("HRP"), and the Weatherization Improvement Program ("WIP"). The plaintiff also alleges that the § 312 program, which provided low cost home improvement loans, was subject in the South End to "racial steering".

HIP, HRP and WIP provided subsidies for home improvement in various targeted areas of the City, including black and white neighborhoods. Originally the subsidy was 20%. Because of low utilization of the program, however, percentages were increased to 40% and 50% for certain classes of homeowners. The subsidy was only available as reimbursement, however, after the improvement was completed. It is this feature that the plaintiff identifies as producing a discriminatory impact, because blacks and other minorities have less available capital and less borrowing capacity to carry out the project. In fact, for those parts of the program which provided 20% subsidy, there were significantly more blacks that failed to complete the programs after initially registering for it than whites or hispanics. When, however, the City increased the subsidy level to 40% and 50%, black participation and completion were proportionately higher than for other groups. The statistical evidence is confusing and somewhat contradictory, but it is probable that the proportion of minority participation in these programs was not significantly below the ratio of minority homeowners to white homeowners in the City.

In February, 1982, the City initiated a pilot program of home improvement subsidy with money available at the outset of the improvement project. There was no evidence at the time of trial as to the success of this program.

In my view, the evidence does not establish that it is more probable than not that the reimbursement feature of the program was the significant cause for failure of black participation at the 20% level, though that is the opinion of plaintiff's expert. It seems at least as likely that the problem was the level of subsidy. In order to participate, the homeowner had to come up with 80% of the cost of the improvement, which would not be reimbursed. When the subsidy was increased, the proportion of black participation increased dramatically.

The exception to the foregoing was the administration of HIP in the South End. Registration for participation in HIP was on a neighborhood basis. The registration office for the South End was in Charlestown, not only on the other side of the City, but in an all white area believed by blacks, justifiably, to be a dangerous area for them to go. Black participation in HIP in the South End was extremely low. It is the uncontradicted testimony of Mr. Upshur, HUD's Director of Fair Housing and Equal Opportunity, that as soon as HUD learned of this situation, it ordered the City to move the office into the South End, which it did.

The South End is also alleged to be the location of racial steering in the administration of the § 312 low interest loan program. The plaintiff asks me to infer deliberate racial steering from the fact that loans to white owners were all granted for location on the east, or downtown, side of Massachusetts Avenue (Old South End) and loans to black owners were all on the other side (South Roxbury). Certainly racial steering is a possible hypothesis [3]. There is no evidence of black owners east of the Avenue or white owners west of the Avenue having been refused loans, however. Moreover, while the white owners' loans were for locations clustered in a few blocks where there has been very active "gentrification", or return of middle class suburbanites, the black owners' loans were similarly clustered in a very small and presumably self-selected

---

**3.** This was in fact the hypothesis accepted by plaintiff's expert.

area. Without more evidence, I cannot exclude the likely effect on market and neighborhood forces and consequently cannot infer that deliberate racial steering in the administration of the program is the probable cause of the results described.

HUD has approved four ongoing UDAG programs for the City: Lafayette Place, Charlestown Navy Yard, Boston Army Base and Copley Place. All of these projects are either mercantile or industrial except Charlestown, which includes luxury housing. No UDAG funds have been sought by the City or approved by HUD for low-income housing for families. The UDAG grants have not been conditioned on the establishment of a fair housing program or the construction of ʹnew low-income housing. They have, however, been designed to improve the economic strength of the City and to provide a large number of jobs.

HUD had $1.7 million available to the City for acquisition of the "Tent City" site near Copley Square for the purpose of building racially integrated low-income housing for the people displaced by the Copley Place project, which was funded in part by UDAG. This housing has never been built.

HUD has never promulgated standards of performance or regulations under Title VIII of the Civil Rights Act of 1968.

As a condition of the CDBGs, the City undertook to increase minority hiring and minority contracting. The levels approved by HUD were very low in comparison to the proportion of blacks in the population and applied only to departments receiving CDBG funds. The City has in fact substantially exceeded these requirements, although black employees are not distributed throughout all departments. The Assessors Department, for instance, remains predominantly white. No such requirements were imposed with respect to UDAG projects.

In approving the City's annual reports, HUD has permitted the City to count rehabilitation of existing low-income family housing as if it were new construction, thus permitting the City to meet HUD guidelines even though new construction has disproportionately favored housing for the elderly in predominantly white neighborhoods.

## CONCLUSIONS OF FACT AND RULINGS OF LAW

HUD's primary assignment under Title I of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. § 5301(c), is to bring about

The development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income.

Under § 109 of that Title (42 U.S.C. § 5309) and § 601 of Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d),

No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.

It is clear that HUD did not itself intentionally discriminate in its programs, and I do not understand the plaintiffs to claim that it did. Their complaint is that HUD finances programs operated by the City that were either deliberately discriminatory or had a discriminatory effect.

 It may be that the City's ineffective response to demands for the enforcement of fair housing, and such actions as placing the § 312 registration office for the South End in Charlestown are tips of a concealed iceberg of masked discrimination throughout the City housing program, as the plaintiff's witnesses and many of HUD's own staff obviously suspect. As explained in the foregoing Findings of Fact, however, adequate proof of the existence of such discrimination was not forthcoming in the trial of this case. Judicial intervention may not be based only on suspicion, no matter how historically justified. I conclude that the evidence does not warrant a finding that HUD financed City programs that were either intentionally dis-

criminatory or had a discriminatory impact. Accordingly, there is no need to discuss the precise scope of § 601 of Title VI and § 109 of Title I and the standards to be applied in their enforcement. *See, e.g., NAACP v. Medical Center, Inc.,* 657 F.2d 1322 (3rd Cir.1981) for an exposition of the problems. The foregoing also precludes a finding for the plaintiff under its Fifth Amendment claim.

Plaintiffs' general claims under Title I are difficult to assess because the defendants' mandate is so broad. While attention to the interests of low-income groups and minorities in particular is specifically mandated, it is a part of a general directive to revitalize the nation's cities. The mix of commercial, industrial and housing construction, as well as the balance between housing for the elderly and housing for families, raise questions of judgment which are not subject to this court's review.

Nevertheless, there is at least one specific standard that must be met under HUD's own regulations. As a condition of the receipt of CDBG funds, the City is required to prepare a Community Development and Housing Plan. 24 C.F.R. § 570.-300(b)(2). The Community Development and Housing Plan must identify "any special needs of identifiable segments of the lower income population". 24 C.F.R. § 570.304(b). No minority needs assessment has ever been prepared by the City, although recently demanded by HUD. HUD has continued CDBG funding for the City in violation of its own regulations.[4]

The failure to secure a minority needs assessment not only violates HUD's regulations under Title I, but seriously impedes HUD in carrying out its statutory mandate under Title VIII of the Civil Rights Act of 1968 (42 U.S.C. § 3601 *et seq.*), which requires HUD to promote fair (i.e., desegregated) housing in all federally financed projects. HUD has never published regulations under Title VIII, and this lack has discouraged local enforcement. While spe-

cific standards are lacking, clearly Title VIII requires effective fair housing enforcement. The financing of desegregated housing so that the housing stock is sufficiently large to give minority families a true choice of location seems to me to be a concomitant obligation of HUD under both Title VI of the 1964 Act and Title VIII of the 1968 Act. *Shannon v. HUD,* 436 F.2d 809 (3rd Cir.1970); *Garrett v. City of Hamtramck,* 503 F.2d 1236 (6th Cir.1974).

Again because of the diversity of HUD's mandate, and the very considerable level of discretion that must remain with HUD in order for its program to operate, it is extremely difficult to quantify HUD *legal* obligations under these statutes. In the case of the City of Boston, however, its efforts to ensure fair housing have been ineffective. It has accepted from the City cosmetic changes in the form of the creation of a Mayor's Office for Fair Housing and some public relations efforts instead of genuine enforcement. It has not used any of its immense leverage under UDAG to provide adequate desegregated housing, except for Mission Park, which was not a project sponsored by the City. It has not even required construction of housing at the Tent City site, which is directly related to the Copley Place UDAG.

I conclude that the defendant has not satisfied minimum levels of compliance with Title VIII of the Civil Rights Act of 1968.

At the outset of this case, the parties agreed that they would withhold their requests for any specific relief or precise form of judgment until my findings of fact, rulings and conclusions had been filed.

Accordingly, the parties are ordered to submit proposed forms of judgment by May 26, 1983, after which the court will hold a hearing, at the convenience of the parties.

---

4. Also arguably in violation of the City's statutory obligation to provide a Housing Assistance

Plan ("HAP"), although this is not clear.