**HAITIAN REFUGEE CENTER, INC. et al., Plaintiffs,**

**v.**

**Admiral James S. GRACEY, Commandant, United States Coast Guard, et al., Defendants.**

**Civ. A. No. 84–2270.**

United States District Court, District of Columbia.

Jan. 10, 1985.

Charles Gordon, Washington D.C., Marvin E. Frankel, Arthur C. Helton and Jo. R.

Backer, Lawyers Committee for Intern. Human Rights, New York City, for plaintiffs; Ira J. Kurzban, Miami, Fla., of counsel.

Lauri Steven Filppu, Mark C. Walters, David V. Bernal, Civ. Div., Dept. of Justice. Richard K. Willard, Acting Asst. Atty. Gen., Civ. Div., Washington, D.C., for defendants.

CHARLES R. RICHEY, District Judge.

## INTRODUCTION

The complaint in this case raises several challenges to the interdiction by United States officials of visaless aliens on the high seas. This program of interdiction was ordered by the President in 1981. The plaintiffs herein are the Haitian Refugee Center ("HRC"), a nonprofit membership corporation located in Miami, Florida, and two of its members. The defendants are the Commandant of the U.S. Coast Guard, and the Commissioner of the Immigration and Naturalization Service ("INS").

The Court currently has before it a motion to dismiss, and cross-motions for summary judgment. Upon consideration of the motions, the supporting memoranda, oral argument, and the entire record herein, the court has decided to grant the defendants' motion to dismiss for failure to state a claim upon which relief can be granted. The Court has today issued an Order consistent with this Opinion.

## FACTS

On September 29, 1981, President Reagan authorized the interdiction of certain vessels containing undocumented aliens on the high seas. Proclamation No. 4865, 46 Fed.Reg. 48107 (published October 1, 1981), *reprinted in* 8 U.S.C.A. sec. 1182 (supp. note). The President had found that the illegal migration of many undocumented aliens into the United States was "a serious national problem detrimental to the interests of the United States", and that international cooperation to intercept vessels trafficking in such migrants was a necessary and proper means of ensuring the effective enforcement of United States immigration laws. *Id.*

By Executive Order No. 12324, also dated September 29, 1981, President Reagan ordered the Secretary of State to enter into cooperative arrangements with appropriate foreign governments for the purpose of preventing illegal migration to the United States by sea. 46 Fed.Reg. 48109, 48110 (published October 1, 1981), *reprinted in* 8 U.S.C.A. sec. 1182 (supp. note). He ordered the Secretary of Transportation to issue instructions to the Coast Guard in order to enforce the suspension of undocumented aliens and the interdiction of any "defined" vessel carrying such aliens. Among the defined vessels were the vessels of foreign nations with which the United States has arrangements authorizing it to stop and board such vessels.

Executive Order 12324 also ordered the Secretary of Transportation to direct the Coast Guard "[t]o return the vessel and its passengers to the country from which it came, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist." *Id.* The Order provided, however, "that no person who is a refugee will be returned without his consent." *Id.* The Coast Guard actions were to be taken only outside United States territorial waters. Indeed, plaintiffs admit that the instant suit challenges only actions taken beyond the territorial boundaries of the United States. Transcript at 48.

The President also ordered the Attorney General, in consultation with the Secretaries of State and Transportation, to take appropriate steps "to ensure the fair enforcement of our laws relating to immigration ... and the strict observance of our international obligations concerning those who genuinely flee persecution in their homeland." *Id.*

On September 23, 1981, the United States and Haiti entered into a cooperative arrangement for the purpose of preventing

illegal migration of undocumented Haitians to the United States by sea. T.I.A.S. 10241. The arrangement permits United States authorities to board Haitian flag vessels on the high seas, to inquire regarding the condition and destination of the vessels, and the status of those on board. If a violation of United States or appropriate Haitian law is discovered, the vessel and passengers may be returned to Haiti. The arrangement provided that "[i]t is understood that under these arrangements the United States Government does not intend to return to Haiti any Haitian migrants whom the United States authorities determine to qualify for refugee status." *Id.* The Government of Haiti also agreed that Haitians returned to their country who are not traffickers will not be subject to prosecution for illegal departure. Lastly, the United States agreed to the presence of a representative of the Navy of Haiti as liason aboard any United States vessel engaged in the implementation of the cooperative arrangement.

## THE PRESIDENT'S CONSTITUTIONAL AND STATUTORY AUTHORITY TO SUSPEND THE ENTRY OF ILLEGAL ALIENS ON THE HIGH SEAS

The President's power to interdict illegal aliens on the high seas derives from statutory and constitutional sources. Congress granted statutory authority in 8 U.S.C. §§ 1182(f) and 1185(a)(1), which provide:

*§ 1182(f)*

Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

*§ 1185(a)(1)*

Unless otherwise ordered by the President, it shall be unlawful—(1) for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe; ....

▮ These provisions make it clear that Congress has allowed the Executive Branch to exercise its broad discretion regarding alien immigration. *Matthews v. Diaz*, 426 U.S. 67, 81, 96 S.Ct. 1883, 1892, 48 L.Ed.2d 478 (1976). It is particularly appropriate for Congress to give the President a high degree of flexibility where the exclusion of aliens directly implicates the sovereignty of our nation and is interwoven with foreign relations. *Id.; Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965); *Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950).

Congress has made clear its approval of the interdiction program through the budget process. In providing funding for the program, in a recent Senate Report accompanying Senate Bill 2852, the Committee on Appropriations reported as follows:

> The Committee is pleased with the Coast Guard's Haitian interdiction program which during the first half of fiscal year 1984 interdicted seven vessels, turning back 349 people. Based on actual arrivals to our shores and the INS estimate of the average historical number of arrivals to our shores each year, the program is 95 percent effective. The Coast Guard is directed to continue the current patrols in the Windward Passage and off the various coastal areas of Florida through fiscal year 1985.

Report, *Department of Transportation and Related Agencies Appropriations Bill*, 1985, S.Rep. No. 98–561 at 15, 98th Cong., 2d Sess. (1984).

Congress has also specified that foreign aid, under the Foreign Assistance Act of 1961, and credits under the Arms Export Control Act, be made available to Haiti only if the President determines that the Government of Haiti "is continuing to cooperate with the United States in halting illegal emigration to the United States from Haiti." Pub.L. No. 98–151, 97 Stat. 971 (1983). Thus, the President's action has

received explicit support from Congress. The statutory authority for high seas interdiction is beyond doubt in this case, where the President and Congress so clearly concur. *Cf. Haig v. Agee*, 453 U.S. 280, 300–01, 101 S.Ct. 2766, 2778–79, 69 L.Ed.2d 640 (1981).

■ The Coast Guard's interdiction is only allowed outside the territorial waters of the United States. The Coast Guard's authority is found in 14 U.S.C. § 89(a), which provides for the stopping of ships on the high seas in order to detect violations of American laws. The powers given the Coast Guard under that statute specifically include "lawful and appropriate action." 14 U.S.C. § 89(a). Thus, an agreement with another country specifically granting the United States permission to return seized vessels and migrants to that country makes such return proper under § 89(a).

■ In addition to statutory authority, the President has implied constitutional power under Article II of the Constitution to suspend entry of certain groups of aliens. *The Chinese Exclusion Case*, 130 U.S. 581, 603–11, 9 S.Ct. 623, 628–632, 32 L.Ed. 1068 (1889). As the Supreme Court stated in *Knauff v. Shaughnessy*, in language applicable here:

> [T]here is no question of inappropriate delegation of legislative power involved here. The exclusion of aliens is a fundamental act of sovereignty. The right to do so stems not alone from legislative power *but is inherent in the executive power* to control the foreign affairs of our nation. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 [57 S.Ct. 216, 81 L.Ed. 255]; *Fong Yue Ting v. United States*, 149 U.S. 698, 713 [13 S.Ct. 1016, 1022, 37 L.Ed. 905]. When Congress prescribes a procedure concerning the admissibility of aliens, it is not dealing alone with a legislative power. It is implementing an inherent executive power.

338 U.S. 537, 542–43, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950) (citations omitted) (emphasis supplied). Even if there is no express statute for the President to execute, he may act to protect threatened American citizens or property. *In re Neagle*, 135 U.S. 1, 63–67, 10 S.Ct. 658, 668–669, 34 L.Ed. 55 (1890). Thus the President clearly has inherent authority to act to protect the United States from harmful illegal immigration.

This inherent power is closely related to the President's undisputed, exclusive power to act "as the sole organ of the federal government in the field of international relations...." *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–20, 57 S.Ct. 216, 221, 81 L.Ed. 255 (1936). "It is pertinent to observe that any policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations...." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952).

In sum, the President's power to suspend the entry of illegal aliens from the high seas by interdiction has a clear constitutional basis.

## UNITED STATES OBLIGATIONS TOWARD REFUGEES ON THE HIGH SEAS

The United States is a party to the 1967 Protocol Relating to the Status of Refugees, which incorporates Articles 2 to 34 of the 1951 Convention Relating to the Status of Refugees. 19 U.S.T. 6223; T.I.A.S. No. 2545. The Protocol defines a "refugee" as any person who, "owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country."

Article 33 of the Convention, incorporated into the Protocol, provides as follows:

> No Contracting State shall expel or return ("refouler") a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership in a particular social group or political opinion.

The Protocol does not specify the procedures for determining refugee status. Those procedures are apparently left to each contracting nation. Although Congress has directed the Attorney General to establish procedures for use when an alien arrives in the United States or seeks admission to the United States from a foreign country (8 U.S.C. §§ 1157, 1158), neither Congress nor the Attorney General has established any procedures for use on the high seas.

## THE COMPLAINT

In the present complaint, the plaintiffs attack the United States program of high seas interdiction of Haitians, which is carried out pursuant to the cooperative arrangement with Haiti. Alleging that "the human rights situation in Haiti [is] ... very grave," and that "hundreds of thousands of Haitians have fled ... to escape ... political persecution," (Amended Complaint ¶¶ 5, 6), the plaintiffs bring several causes of action against the interdiction program.

In Count I, the plaintiffs contend that the actions of defendants under the interdiction program violate the rights of Haitians under the Refugee Act of 1980 and the Immigration and Nationality Act, 8 U.S.C. § 1253. In Count II plaintiffs contend that defendants have deprived Haitian refugees on interdicted vessels of their liberty and rights afforded them by the Refugee Act and the Immigration and Nationality Act, in violation of the Fifth Amendment of the Constitution.

In Count III plaintiffs allege that the interdiction program fails to satisfy the "nonrefoulment obligation" imposed by the United Nations Protocol and Universal Declaration of Human Rights by creating a substantial risk that political refugees will be forcibly returned to face persecution. Plaintiffs also contend that the program violates the provision against racial and other discrimination in Article 3 of the United Nations Convention. Count IV charges a violation of the extradition statute, 18 U.S.C. sec. 3181 *et seq.*, and the Extradition Treaty between the United States and Haiti, 34 Stat. 2858.

After addressing the preliminary issue of standing, the Court addresses each of these counts below. None of them states a claim upon which relief can be granted.

## THE PLAINTIFFS HAVE STANDING TO RAISE THESE CLAIMS

The defendants challenge the standing of the plaintiffs HRC and two of its members. As can be seen by a brief examination of the role of the HRC, the defendants' argument fails.

Plaintiff HRC is a nonprofit membership corporation organized under the laws of the State of Florida. The two individual plaintiffs, Edouard Franck and Carlos Dorsainville, are members of the HRC. The sole purpose of the HRC, as set forth in its by-laws, is to promote the well-being of Haitian refugees through appropriate programs and activities, including legal representation. A principal activity of the HRC has been the legal representation of Haitian refugees who are seeking political asylum or other official status in this country. *See generally Louis v. Nelson,* 544 F.Supp. 973 (S.D.Fla.1982), *aff'd in part, rev'd in part, sub nom. Jean v. Nelson,* 711 F.2d 1455 (11th Cir.1983), *dismissed in part,* 727 F.2d 957 (11th Cir.), *reh. denied,* 733 F.2d 908 (11th Cir.1984) (*en banc*); *Haitian Refugee Center v. Smith,* 676 F.2d 1023 (5th Cir.1982).

In order to establish standing to sue in a federal court, the plaintiffs must satisfy constitutional requirements and prudential considerations. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204, 45 L.Ed.2d 343 (1975). The constitutional limitations on standing require the plaintiffs to be able to demonstrate some "injury in fact" resulting from the defendants' action. *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The prudential considerations include whether the plaintiffs' interests at stake are "arguably within the zone of interests to be protected or regulated" by the various causes of action in the complaint. *Associa-*

tion of *Data Processing Service Organizations v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Additionally, the plaintiffs must allege an injury in some way different from the injury suffered by the general public. *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758. The HRC and its two member-plaintiffs satisfy these requirements of standing.

### 1. The Standing of the HRC.

Plaintiff HRC has alleged injury both to itself as an organization, and in a representative capacity for its members.

In bringing suit on behalf of itself as an organization, the constitutional basis for HRC's standing is assured by *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). In that case, a nonprofit organization known as "Housing Opportunities Made Equal" ("HOME") brought suit against a realty corporation alleging racial steering in violation of the Fair Housing Act. HOME's organizational purpose "was 'to make equal opportunity in housing a reality in the Richmond Metropolitan Area'", 455 U.S. at 368. The Supreme Court held that because the defendants' challenged practices had "perceptibly impaired HOME's ability to provide counseling and referral services for low and moderate-income homeseekers", and because this constituted a "concrete and demonstrable injury to the organization's activities [and a] consequent drain on [its] resources", HOME had met the constitutional standing requirements. 455 U.S. at 379, 102 S.Ct. at 1124.

HRC's position in the present case resembles that of HOME in *Havens*. Like the nonprofit organization in *Havens*, the HRC exists to provide counseling, legal and other services to a specific and limited class of persons—Haitian refugees. HRC alleges that the interdiction program, like the alleged racial steering program in *Havens*, impairs its ability to carry out its basic functions, i.e., counseling Haitian refugees. Thus, HRC's allegations plainly satisfy the constitutional standing requirements.

HRC also brings suit in a representative capacity to redress injuries suffered by its members. In this capacity, HRC alleges injuries to the associational ties of its members. The Supreme Court established the controlling test for standing by such an organization in *Hunt v. Washington Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977):

> [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.

■ The HRC members have standing to sue in their own right. Although their alleged injury is not easily quantifiable, such as economic injury, "actual harm to individual values of an abstract or esoteric nature can provide the basis for standing." *O'Hair v. White*, 675 F.2d 680, 687 (5th Cir.1982). Significantly, the HRC members allege a harm not suffered by most of the population. *Cf. Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758; *Warth*, 422 U.S. at 500, 95 S.Ct. at 2205. *See also NAACP v. Harris*, 567 F.Supp. 637 (D.Mass.1983) (allowing the NAACP to bring suit on behalf of black people in Boston, "a defined and discrete constituency"). The HRC similarly represents a "defined and discrete constituency", and challenges, *inter alia*, the United States' cooperative arrangement with Haiti. Because HRC's members, Haitian refugees in the U.S., could bring suit themselves, the HRC has satisfied the first prong of the *Hunt* test.

The HRC also satisfies the second part of the *Hunt* test—that of germaneness. The HRC's primary purpose is to assist indigent Haitians, often in confrontations with U.S. authorities. "[T]he work of HRC focuses on the representation of members *and prospective members* before the INS." *Haitian Refugee Center v. Civiletti*, 503 F.Supp. 442, 474 (1980), *modified*, 676 F.2d 1023 (5th Cir.1982) (emphasis supplied). Therefore, the interests which the

HRC seeks to protect in this lawsuit are germane to its purposes. *Hunt,* 432 U.S. at 343, 97 S.Ct. at 2441.

The defendants make no serious argument that the claims asserted or the relief sought requires the participation in this suit of the individual HRC members. The HRC seeks injunctive and declaratory relief against the interdiction program. As the Court noted in *Warth,* 422 U.S. at 515, 95 S.Ct. at 2213, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." Accordingly, the HRC satisfies that third prong of the *Hunt* test.

Having met the constitutional requirements for standing to bring suit, the HRC must also satisfy certain prudential considerations. As previously noted, the interests at stake must be arguably within the zone of interests protected by the statute, and the alleged injury must be in some way different from that suffered by the general public. *See Association of Data Processing,* 397 U.S. at 153, 90 S.Ct. at 829; *Valley Forge,* 454 U.S. at 472, 102 S.Ct. at 758. In the present case, as in *Hotel & Restaurant Employees Union, Local 25 v. Smith,* 563 F.Supp. 157 (D.D.C.1983), these considerations weigh in favor of plaintiffs' standing.

In *Hotel & Restaurant Employees,* this Court upheld the standing of a labor union to challenge the practices of the State Department and the Attorney General with regard to the immigration applications of Salvadoran nationals. Because the union alleged injury to its own "ability to organize and retain Salvadoran members as well as its efforts to protect the rights of its existing Salvadoran members to be secure in their jobs", and injury to the associational ties of its members, the Court held the allegations "plainly sufficient to support standing." 563 F.Supp. at 159. Citing *Hunt, Warth* and *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), the Court concluded that "surely standing must be allowed here, where plaintiff has alleged a direct injury to itself as well as to its members' associational ties." *Id.* at 160.

The HRC in the present case stands in a similar position to that of the union in *Hotel & Restaurant Employees.* The HRC, by challenging a practice of the United States authorities relating to the immigration of Haitian nationals, is seeking to protect both its own interests and the associational interests of its members. Just as the union in *Hotel & Restaurant Employees* fell within the zone of interests intended to be protected by the constitutional and statutory provisions governing political asylum and extended voluntary departure, so does the HRC fall within the zone of interests of the constitutional, statutory, and international obligations found in the instant complaint. Moreover, because the HRC represents a "defined and discrete constituency", *NAACP v. Harris,* 567 F.Supp. at 639–40, the alleged injury suffered by HRC and its members is not shared by the community at large. Therefore, the HRC, in addition to meeting the constitutional requirements of standing, satisfies the relevant prudential considerations.

### 2. The Standing of Edouard Frank and Carlo Dorsainville.

Plaintiffs Edouard Frank and Carlo Dorsainville, members of the HRC, have alleged injury to their associational rights as a result of defendants' actions. Thus, for reasons already discussed, *supra* p. 1402, these individual plaintiffs have standing to sue.

## THE COMPLAINT FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

*Count I—The Refugee Act and the Immigration and Nationality Act Do Not Provide Aliens Outside the United States with the Right to Apply for "Refugee" Status Nor with the Right to "Exclusion Procedures".*

■ Plaintiffs' claims under Count I amount to contentions that interdicted Haitians are entitled to invoke procedures established by the Refugee Act of 1980, Pub.L. No. 96–212, 94 Stat. 109 (March 17, 1980), and the Immigration and Nationality

Act. However, those acts only establish procedures guaranteed to aliens within the United States. Because the interdicted Haitians never reach the United States, these two acts can provide no relief to plaintiffs.

The Refugee Act of 1980 amended the Immigration and Nationality Act and added an asylum provision:

(a) The Attorney General shall establish a procedure for an alien *physically present in the United States or at a land border or port of entry,* irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 101(a)(42)(A).

8 U.S.C. § 1158(a) (emphasis supplied).

The present action challenges the high seas interdiction of Haitians, not the treatment of Haitians within the United States (or at a land border or port of entry). This statute by on the high seas, and thus this statute cannot form the basis for a claim for relief.

Count I also stresses that the interdiction violates the deportation provisions of the Immigration and Nationality Act, 8 U.S.C. § 1253(h). That section provides as follows:

The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(19) of this Title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group or political opinion.

This provision is found in Part V (Subchapter II) of the Immigration and Nationality Act, which governs deportation and adjustment of status. The deportation provisions of Part V only apply to aliens "in the United States." 8 U.S.C. § 1251, 1253(a). Thus it is clear that this section, like the Refugee Act, can provide no relief against the program of high seas interdiction.

Plaintiffs' remaining contention in Count I is that interdicted Haitians are unlawfully denied the benefit of exclusion proceedings. The Immigration and Nationality Act has established procedures for the exclusion of aliens, including the entitlement to a hearing. *See* 8 U.S.C. § 1226. Those rights, however, are reserved for aliens arriving "by water or by air at any port within the United States from any place outside the United States." *Id.* Contrary to plaintiffs' assertion, the interdicted Haitians also have no statutory "right to counsel", which is reserved to those aliens in "exclusion or deportation proceedings." 8 U.S.C. § 1362. Again, because those "exclusion or deportation proceedings" are restricted to aliens arriving "at any port within the United States", 8 U.S.C. § 1221, it is clear that the interdicted Haitians are entitled to none of these statutorily-created procedural rights, including the right to counsel.

The plaintiffs contend that "the Executive cannot free itself of its procedural obligations merely by reaching out to sea and changing the locale of its process." Plaintiffs' Memorandum in Support of Cross-Motion for Summary Judgment at 11. However, because the statutory obligations do not exist until an alien comes within the United States, plainly the Executive *can* avoid those obligations by interdicting the Haitians on the high seas. As long as interdiction is within the power of the President, which it is (*see supra* pp. 1398–1400), there can be no claim that it violates the statutory "rights" of aliens in other respects merely because it frustrates the efforts of the illegal aliens to reach the point where those rights attach. Until a person has a right, there can be no denial of that right.

In sum, plaintiffs are entitled to no relief under Count I. Interdicted Haitians have no right to apply for either asylum pursuant to 8 U.S.C. § 1158 or withholding of deportation under § 1253(h). Nor are they entitled to any "exclusion procedures". Because all of these rights apply only to aliens found within the United States, Count I fails to state a claim upon which relief can be granted.

*Count II—The Program of Interdiction Does Not Violate Due Process.*

██ In Count II the plaintiffs contend that the defendants have acted beyond their constitutional and statutory authority and have deprived Haitian refugees of their liberty. Plaintiffs allege that these actions violate the Fifth Amendment because they violate the "standards of due process defined by Congress in the Refugee Act and the Immigration and Nationality Act." Amended Complaint ¶ 52. This Count fails to state any claim upon which relief can be granted.

As previously discussed, the Executive has ample constitutional and statutory authority for the high seas interdiction program. *See supra* pp. 1398–1400. Plaintiffs' contention to the contrary is simply without merit.

Similarly, plaintiffs' assertion of the Fifth Amendment due process violation cannot withstand scrutiny. As exhaustively detailed in the discussion of Count I, the statutory rights plaintiffs seek to invoke do not apply to aliens outside the United States. Therefore, the defendants have not, as alleged in Count II, violated the Congressionally defined standards of due process found in the Refugee Act and the Immigration and Nationality Act.

Moreover, any claim founded on the Fifth Amendment fails in this context. Aliens have no constitutional rights to enter the United States. *Kleindienst v. Mandel,* 408 U.S. 753, 765–66, 92 S.Ct. 2576, 2582–83, 33 L.Ed.2d 683 (1972); *Galvan v. Press,* 347 U.S. 522, 530–32, 74 S.Ct. 737, 742–43, 98 L.Ed. 911 (1954). As the Supreme Court recently stressed in *Landon v. Plascencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982):

> This Court has long held that an alien seeking admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative.

(Citations omitted). Again, in *Kwong Hai Chew v. Colding,* 344 U.S. 590, 600, 73 S.Ct. 472, 479, 97 L.Ed. 576 (1953), the Supreme Court noted that " 'excludable' al-iens . . . are not within the protection of the Fifth Amendment."

This conclusion has recently been buttressed by the Eleventh Circuit Court of Appeals, sitting *en banc. Jean v. Nelson,* 727 F.2d 957 (11th Cir.1984). That case, which arose out of a class action brought on behalf of Haitian aliens who had arrived in Southern Florida and who were detained at INS facilities pending a final determination of the merits of their asylum petitions, presented "complex and fundamental questions concerning the rights of excludable or unadmitted aliens and the authority of the Executive branch over immigration matters." 727 F.2d at 961. The Court noted that there is "a fundamental distinction between the legal status of excludable or unadmitted aliens and aliens who have succeeded in effecting an 'entry' into the United States, even if their presence here is completely illegal." *Id.* at 967. The court went on to hold, in accordance with a long line of Supreme Court cases, that "[a]liens seeking admission to the United States therefore have no constitutional rights with regard to their applications and must be content to accept whatever statutory rights and privileges they are granted by Congress." *Id.* Plainly, then, the interdicted Haitians have no Fifth Amendment rights, and Count II must be dismissed.

*Count III—The United Nations Protocol and the Universal Declaration of Human Rights Do Not Provide Rights Upon Which Plaintiffs May Rely.*

██ In Count III the plaintiffs invoke the 1976 United Nations Protocol Relating to the Status of Refugees and the Universal Declaration of Human Rights. Because neither document affords any rights to the interdicted Haitians, Count III cannot form the basis for any relief.

██ The plaintiffs claim that the program of interdiction violates the non-refoulement obligations of the United Nations Protocol. However, it has long been established that for a treaty to provide rights enforceable in a United States Court, the treaty must be one which is self-executing. *See Foster v. Neilson,* 27 U.S. (2

Pet.) 253, 314, 7 L.Ed. 415 (1829). "Unless a treaty is self-executing, it must be implemented by legislation before it gives rise to a private cause of action." *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1298 (3d Cir.1979); *See also Hanoch Tel-Oren v. Libyan Arab Republic*, 517 F.Supp. 542, 547 (D.D.C.1981), *aff'd*, 726 F.2d 774 (D.C.Cir.1984).

The United Nations Protocol is not self-executing. *Bertrand v. Sava*, 684 F.2d 204, 218–19 (2d Cir.1982). In *Bertrand*, the Second Circuit held that "the Protocol's provisions were not themselves a source of rights under our law unless and until Congress implemented them by appropriate legislation." *Id.* This conclusion is compelled by the terms of the treaty itself, which provided that the signatories were to communicate to the United Nations the "laws and regulations which they adopt to ensure the application of the Present Protocol." 19 U.S.T. 6226. Treaties with "[s]uch provisions are uniformly declared executory." *United States v. Postal*, 589 F.2d 862, 876–77 (5th Cir.), *cert. denied*, 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979).

· Congress has implemented the Protocol, at least in part, through the Refugee Act of 1980. *Bertrand*, 684 F.2d at 218. However, that statute does not provide any rights to aliens outside of the United States. 8 U.S.C. § 1158. Thus, the plaintiffs can find no relief in the United Nations Protocol.

The plaintiffs also assert in Count III that the interdiction program violates Haitians' rights under the Universal Declaration of Human Rights, which was adopted by the General Assembly of the United Nations in 1948. G.A.Res. 217, 3 U.N. GAOR, U.N. Doc. 1/777 (1948). This declaration is merely a nonbinding resolution, not a treaty. "It is not and does not purport to be a statement of law or of legal obligation." *In re. Alien Children Education Litigation*, 501 F.Supp. 544, 593 (S.D.Tex.1980) (quoting 5 Whiteman, *Digest of International Law* 243 (1965), in turn quoting Mrs. Franklin D. Roosevelt, then-U.S. representative in the General Assembly). It is plain, therefore, that this declaration provides no right of action for the plaintiffs.

*Count IV—The Extradition Treaty and Statute Provide Relief Only to Haitians in the United States.*

In Count IV the plaintiffs allege that the defendants' interdiction program violates a 1905 Extradition Treaty with Haiti, 34 Stat. 2858, and the federal extradition statute, 18 U.S.C. § 3181 *et seq.* Like the other statutes mistakenly relied upon by plaintiffs, the extradition treaty and statute provide relief only to Haitians in the United States. Because the interdiction program complained of occurs on the high seas, outside the United States, this Count fails to state a claim upon which relief can be granted.

The treaty between the United States and Haiti for mutual extradition of fugitives from justice applies only to persons accused or convicted of crimes committed in one country who are "found in the territory of the other." Treaty of Extradition, January 28, 1905, United States—Haiti, Art. I, 34 Stat. 2858, 2859. This treaty is facially inapplicable to the interdiction program, which is carried out on the high seas. Because the interdicted Haitians are not "found in the territory of" this country, the treaty can provide no relief to the plaintiffs.

Similarly, the extradition statute relied upon by plaintiffs applies only to "any person found within" the jurisdiction of a court of the United States. 18 U.S.C. § 3184. Clearly the interdiction program does not run afoul of this statute.

Because neither the extradition treaty nor statute applies to defendants' activities on the high seas, Count IV fails to state a claim upon which relief can be granted.

## CONCLUSION

Although the plaintiffs have standing to bring this suit, none of the four Counts contained in the instant complaint states a cause of action upon which this Court may grant relief. Because the interdiction program herein attacked occurs outside the

jurisdiction of the United States, neither the statutes nor the treaty upon which plaintiffs rely can provide any relief. Because the interdicted Haitians never reach the shores of the United States, they are entitled to no protections contained within the Fifth Amendment of the Constitution. The plaintiffs also can find no relief in the United Nations Protocol Relating to the Status of Refugees and the Universal Declaration of Human Rights.

It is clear that the President instituted the interdiction program pursuant to ample constitutional and statutory authority. *See generally Knauff v. Shaughnessy*, 338 U.S. 537, 542–43, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950); *In re Neagle*, 135 U.S. 1, 63–67, 10 S.Ct. 658, 668–669, 34 L.Ed. 55 (1890). This program is carried out pursuant to an agreement with Haiti, and is therefore intricately interwoven with matters of foreign relations. *Knauff*, 338 U.S. at 542, 70 S.Ct. at 312. Because such programs "are so exclusively entrusted to the political branches of government", this Court's review is correspondingly narrow. *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952). Therefore, the result which the Court today reaches should not surprise the plaintiffs. Although the actions of the plaintiffs, and their representatives, are commendable, and stem from the highest form of humanitarian concern, the Court cannot allow its sympathy for the plight of the Haitians to blind it from the law. The Court simply can find no basis for relief. The Court has today issued an Order, consistent with this Opinion, which dismisses this action for the reasons herein stated.