LATINOS UNIDOS DE CHELSEA EN
ACCION (LUCHA), et al.,
Plaintiffs, Appellants,

v.

SECRETARY OF HOUSING AND
URBAN DEVELOPMENT, et al.,
Defendants, Appellees.

No. 85–1573.

United States Court of Appeals,
First Circuit.

Argued May 7, 1986.

Decided Aug. 12, 1986.

Alan Jay Rom, Lawyers Committee for Civil Rights Under Laws of the Boston Bar Ass'n, with whom Stuart T. Rossman, Sheara F. Friend and Gaston Snow & Ely Bartlett were on brief for plaintiffs, appellants.

Marshall D. Stein, Sp. Counsel to the City of Chelsea, with whom Cherwin & Glickman was on brief for City of Chelsea and Mayor of Chelsea, Mass.

Howard S. Scher, Civ. Div., Dept. of Justice, with whom William F. Weld, U.S. Atty., Richard K. Willard, Asst. Atty. Gen., Michael Jay Singer, Civ. Div., Dept. of Justice, Gershon M. Ratner, Associate Gen. Counsel for Litigation, Howard M. Schmeltzer, Sp. Asst. to the Associate Gen. Counsel for Litigation, and Anthony J. Ciccone, Jr., Trial Atty., HUD Office of Litigation, were on brief for federal defendants, appellees.

Before COFFIN and TORRUELLA, Circuit Judges, and MALETZ,* Senior Judge.

COFFIN, Circuit Judge.

Plaintiffs brought this civil rights action alleging that the city of Chelsea, Massachusetts, and three officials of the United States Department of Housing and Urban Development (HUD),[1] deprived Chelsea's minority population of equal opportunities in employment, housing and government contracts made available through several federally funded programs. The plaintiffs, Latinos Unidos De Chelsea En Accion (LUCHA) and four individual members of LUCHA, appeal three orders of the district court, which denied class certification, granted the federal defendants' motion to

---

* Of the United States Court of International Trade, sitting by designation.

1. Plaintiffs sued the three individuals in their official capacities. For simplicity's sake, we shall refer to them collectively as HUD.

dismiss, granted summary judgment for the city defendants on all but one claim and, after trial, held that the city did not discriminate in its Housing Improvement Program. We have carefully reviewed the record and the legal precedents and have found no reversible error.

In an effort to simplify the many issues in this case, we begin with a description of the relevant funding programs. We then present factual background about the city of Chelsea, the nature of the community development activities for which it used federal funds, and the annual reviews of the city's projects. Finally, we discuss why we find no violations of antidiscrimination laws in the challenged areas of employment, housing and contracts.

## I.

Chelsea received the federal grants at issue in this case between 1975 and 1980 under the Community Development Block Grant (CDBG) Entitlement Program, 42 U.S.C. §§ 5301–5317; the Small Cities Program (SCP), 42 U.S.C. § 5306(d), which is a subprogram of the CDBG; and the Urban Development Action Grant (UDAG) program, 42 U.S.C. § 5318. All three programs are part of Title I of the Housing and Community Development Act (HCDA) of 1974, whose primary objective "is the development of viable urban communities, by providing decent housing and a suitable living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 U.S.C. § 5301(c).[2] See also 42 U.S.C. § 5304(b)(3) (current law) (maximum feasible priority should be given "to activities which will benefit low- and moderate-income families or aid in the prevention or elimination of slums or blight").

Both the CDBG and UDAG programs have nondiscrimination requirements. Recipients in both programs, under a specific provision of the HCDA, are prohibited from discriminating on the basis of race, color, national origin or sex. 42 U.S.C. § 5309. CDBG grantees also are required to certify "that the program will be conducted and administered in conformity" with Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631. 42 U.S.C. § 5304(a)(5). Title VI prohibits recipients of federal funds from discriminating on the basis of race, color or national origin in the use of those funds; Title VIII prohibits discrimination in the sale or rental of housing. The Secretary is charged with making an annual review of the CDBG recipient's programs to determine compliance with applicable laws, and may impose conditions on a present year's grants as a result of the review of a prior year's program. 24 C.F.R. § 570.910(b) (April 1979).

Under the UDAG program, nondiscrimination provisions are built into the eligibility requirements. Cities may receive UDAG grants only if they have "demonstrated results in providing housing for low- and moderate-income persons and in providing equal opportunity in housing and employment for low- and moderate-income persons and members of minority groups." 42 U.S.C.A. § 5318(b)(1) (West 1986). And in selecting one UDAG application over another, HUD must consider the "impact of the proposed urban development action program on the special problems of low- and moderate-income persons and minorities." 42 U.S.C. § 5318(e)(3).

Aside from these nondiscrimination limitations, CDBG and UDAG recipients have wide latitude in choosing specific programs that meet the statute's objectives. See 42 U.S.C. § 5305. Acceptable community development programs include the acquisition and rehabilitation of blighted or deteriorated property; construction of neighborhood facilities such as senior centers, utilities, streets, parks and fire protection

---

**2.** Citations to statutory provisions and regulations, unless otherwise noted, generally refer to the laws as they existed in the mid- to late-1970s, when Chelsea received most of the funds at issue here. Recent amendments have changed the language, if not the substance, of Title I.

services; code enforcement in deteriorated areas; and provision of public services concerned with child care, health and drug abuse. 42 U.S.C. § 5305(a)(1)–(12).

## II.

Chelsea is a densely populated city of 1.8 square miles. According to the 1960 census, Chelsea's population was 33,749, including about 1% minorities. The 1970 census showed that the city's population had dropped to 30,625, of which 1.6% were black and 3.5% were Hispanic. In the mid-1970s, Chelsea's population changed dramatically. By the time the city conducted a survey in February 1978, the Hispanic population had risen to 19.5% of the total, with other minorities representing an additional 2.6%. The survey showed that about half of the Hispanics had arrived in the preceding three years, and that less than one-fourth had lived in Chelsea for five years or more. Despite the rapid growth in the number of Hispanics, the overall population in Chelsea continued to decline, falling to approximately 25,000 in 1979. In a 1978 letter to HUD, Chelsea's mayor attributed the outmigration to "fires, general deterioration and abandonment, high taxes and few amenities and fewer services from a poor city to a dependent population". [App. at 469.]

The 1978 survey also revealed the following characteristics of Chelsea:

—85.6% of Hispanic households in the city were designated by HUD standards as low- or moderate-income, while 78.5% of the nonminority households also qualified for HUD assistance;

—rental households comprised 73.3% of all households in Chelsea (only 1% of black residents and 5.1% of Hispanic residents were homeowners);

—Chelsea is a city of multi-unit housing structures; 725 buildings contained a single unit; 1529 contained two units; 948 contained three units; and 455 contained four or more units; [App. at 248.]

—overcrowding was a problem for 17.8% of households surveyed, and a problem particularly for Hispanics;

—a significantly higher percentage of blacks and Hispanics (compared with non-minorities) reported housing problems such as sewage backup, leaky roof, cracked/broke interior walls or ceilings, peeling paint; rodents and insects;

—the elderly population, which is 98.6% non-minority, comprised about 20% of the total population.

Thus, when Chelsea began applying for federal community development funds in 1975, it was largely a city of renters, losing residents overall but with a growing Hispanic population that apparently was experiencing the city's housing problems more acutely than other residents. Many housing structures needed varying degrees of physical rehabilitation, although a large percentage of the population apparently was unable to make the personal investment in the needed improvements. In addition, a 1976 survey showed a 1% vacancy rate; thus, the city presumably needed additional housing, with the greatest need in all likelihood among low-income families.

## III.

Over the course of the six years under consideration in this case, Chelsea received approximately $20 million in federal funds for community development projects. We discuss below the nature of some of these projects, and the reaction toward them from agencies reviewing the city's compliance with nondiscrimination requirements.

A. *Community Development Block Grant Programs, 1975–1980.* Chelsea participated in the CDBG program for five years, conducting a variety of programs aimed at different aspects of community development, including fire prevention, housing code enforcement, playground development, street lighting, and road construction. Several of these programs were begun in the areas with the largest minority populations.[3] In addition, in the early

---

3. A summary prepared as part of the review of the first-year programs, *see* 24 C.F.R. § 570.909

years of the CDBG program, funds also were allocated to a bilingual day care center, a housing legal services program for low income families, minorities and the elderly, and health services directed toward lower income minority persons.

### 1. The first two years (1975–1976; 1976–1977)

A major project begun in the first year was the Mayor's Housing Improvement Program (HIP), which provided grants of 20 percent of the cost of repairs undertaken in owner-occupied homes. This program was expanded the second year to include repairs done by absentee landlords "because it was felt that many of the persons the program should be affecting live in units owned by absentee landlords." Most of the people benefiting from this particular program were not minorities because very few minorities owned their own homes.[4]

### 2. The third year (1977–1978)

In the third program year, 1977–1978, the city reported that, in addition to the continuing programs, Chelsea's Office of Community Development would hire a Community Services and Planning Officer "[t]o insure that the needs of the growing Spanish population are met". [App. at 125.] The city also reported that it was in the final stages of developing a comprehensive plan to respond to Hispanic needs, explaining that the city was focusing on this group "because of the intense level of in-migration of Spanish speaking persons in Chelsea."

The Massachusetts Commission Against Discrimination (MCAD) and the North Suffolk Legal Assistance Association (NSLAA) reviewed Chelsea's first three applications,[5] and found them to be unsatisfactory because they failed to adequately assure Chelsea's minority residents equal participation in the program's benefits. The NSLAA, which reviewed the third-year application, claimed that the city's Housing Assistance Plan failed to analyze the impact of the growing Hispanic community on future housing needs.[6] It particularly objected to Chelsea's emphasis on rehabilitating homes through the provision of assistance to homeowners, rather than on expanding housing opportunities for low- and moderate-income persons through building new units of low- and moderate-income housing. NSLAA concluded that Chelsea's proposals violated Title I of HCDA because they did not meet "the primary objective of the Act by principally benefitting low- and moderate-income persons." See 24 C.F.R. § 570.304(a)(2) (April 1979) (requiring fund recipients to pinpoint special needs of minority community and to design programs to fulfill them). Moreover, NSLAA concluded, the failure to specially assist the minority community excluded minorities from meaningful participation in the benefits of Title I, thus violating Title VI of the Civil Rights Act of 1964

---

(April 1979), showed that housing code enforcement was to be concentrated in two census tracts with the highest percentage of low income and minority residents. The summary also stated that the major playground project was planned for the neighborhood with the highest percentage of lower income minority persons. That area also had a large number of children under 12. Although street improvements were planned for all four residential neighborhoods, "[t]he city has established a policy of focusing the highest proportion of local resources allocated for public facility improvements in areas inhabited by lower income and minority persons."

4. In fiscal year 1978, the HIP program accounted for $345,000 of the $1.9 million in CDBG funds that the city proposed to spend that year.

5. Under the Federal Office of Management and Budget, Circular No. A–95 (revised Jan. 2, 1976), recipients of funds under the Housing and Community Development Act must submit their applications to specified local agencies for review. These agencies submit comments to HUD. See 24 C.F.R. § 570.307(c) (April 1979).

6. The Housing Assistance Plan (HAP) is a comprehensive planning statement that contains data about the need for lower income housing and describes the city's plans for responding to that need. 42 U.S.C. § 5304(a)(4). A HAP must be submitted with each application for CDBG funds.

and the nondiscrimination provision of Title I, 42 U.S.C. § 5309.

NSLAA also pointed to the low percentage of minority persons employed in city agencies receiving federal funds and charged that "maintaining these discriminatory employment practices [violates] Title VI of the 1964 Civil Rights Act as well as the CDBG Act itself." [7] As a result of NSLAA's concerns, HUD agreed to condition its third-year grant approval on the city's promise to conduct a survey in cooperation with NSLAA to determine the size and needs of the Hispanic community. [8]

3. *The fourth and fifth years (1978–1979; 1979–1980)*

The fourth and fifth years of CDBG funding transpired in similar fashion. Chelsea implemented some programs of apparently direct benefit to the Hispanic community, including initiation of a Hispanic Neighborhood Center Project that provided housing referrals, job information and other services to the Hispanic community. Nevertheless, both the MCAD and HUD's Fair Housing & Equal Opportunity Division (FH & EO Division) concluded that Chelsea's actions to prevent discrimination continued to be inadequate. The FH & EO Division found that minority employment remained low (2.1% of all full-time city employees in 1978–79), and that of 32 business contracts awarded thus far during the CDBG program, none had been awarded to a minority. [9]

In the fourth year, HUD responded to the persistent concerns about Chelsea's performance by requiring revisions in the city's Housing Assistance Plan to provide for an increase in family housing goals. HUD also required that Chelsea submit a "special assurance" that its employment practices were in compliance with 24 C.F.R. § 570.601(b)(iv) (April 1979), which requires that recipients ensure that all residents have equal access to CDBG program benefits. [App. at 284.] The "special assurance" is a form of remedial action in which HUD requires grant recipients to specify performance goals and a specific timetable for achieving results within six months. *See* 24 C.F.R. § 570.910(b)(4) (April 1, 1979).

In October 1978, FH & EO Division staff conducted a monitoring visit to review Chelsea's performance under the CDBG program. They concluded that Chelsea had not taken the necessary "affirmative actions" to provide minority employment and that the city's "special assurance" was "woefully inadequate"; rather than setting goals and timetables for the hiring, training and promoting of minority employees, Chelsea's mayor had simply sent a letter assuring HUD that the city would not discriminate. The FH & EO Division also found Chelsea's actions to prevent housing discrimination to be unacceptable, and it recommended the following: (1) establishment of a goal of hiring at least 10 percent minority contractors; (2) establishment of a Mayor's Office of Fair Housing; (3) design of a Fair Housing Plan that would provide for family rather than elderly housing; (4) hiring a full time compliance officer who is bilingual. [App. at 298.]

---

7. In June 1978, NSLAA filed an administrative complaint on behalf of LUCHA, which led to the filing of the instant suit in that same year against HUD. After a decision on standing by this court, *NAACP, Boston Chapter v. Harris*, 607 F.2d 514 (1st Cir.1979), which remanded the case, plaintiffs joined the City of Chelsea and its mayor as defendants.

8. HUD's Fair Housing and Equal Opportunity Division had found that, insofar as the city and NSLAA agreed that Chelsea's 1977 Housing Assistance Program understated the housing needs of Hispanics, because the plan was based on 1970 census data, the city's application was in

violation of 24 C.F.R. § 570.306(b)(20(i) (April 1979) (requiring that applicant provide estimates of housing assistance needs of lower-income persons, including estimates for "any identifiable segment of the total group of lower-income households").

9. A discrepancy that does not affect our analysis exists with regard to the number of business contracts awarded to minorities. The district court found that, in Program Year 1, two contracts (as opposed to none) totalling 18.6% of the contracts awarded went to minority businesses.

Apparently in light of Chelsea's failure to improve, HUD attached "special conditions" to the fifth-year CDBG grant in the areas of employment, fair housing and minority entrepreneurship. These conditions restrict the use of funds in those areas and are a more serious sanction than the prior request for a "special assurance". *See* 24 C.F.R. § 570.910(b)(9) (April 1979). Specifically, in noting that Hispanics had not benefitted from the city's housing rehabilitation programs in proportion to their numbers in the community, HUD recommended changes in Chelsea's programs such as the establishment of a preference for Hispanic homeowners and for homeowners with Hispanic tenants; expansion of the rehabilitation programs to multi-family structures occupied by Hispanics and other minorities; and homeownership counseling for Hispanics and other minority residents of Chelsea. HUD also required development of an affirmative action plan that would establish a goal for hiring minorities at the rate of at least 51 percent in city agencies receiving CDBG funds, establishment of a compliance unit, and development of goals for awarding business contracts to minorities. [App. at 363.]

B. *Small Cities Program, 1978–1981.* Starting in 1978, Chelsea received SCP funds, as well as CDBG funds,[10] for the same type of community programs. In its review of Chelsea's first SCP application in 1978, the FH & EO Division noted that Chelsea had failed to propose explicit activities to meet its obligations under Titles VI and VIII. Those obligations, according to the Division, arose from Title VI and HCDA regulations specifying that:

"Even in the absence of ... prior discrimination, a recipient in administering a program should take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race, color, national origin[, or sex]." 24 C.F.R. § 1.4(b)(6)(ii) (April 1985) (sex included as

a status in HCDA regulation only). *See* 24 C.F.R. § 570.601(b)(4)(ii) (April 1979). HUD approved the SCP grant without conditions, however, noting in its approval letter that the FH & EO concerns would be communicated to the city in a separate letter with the expectation that the city would give the comments immediate attention.

In awarding the second-year SCP funds, HUD imposed the same "special conditions" that it had attached to the fifth-year CDBG grant. The following year, 1980–1981, the FH & EO Division review report concluded that Chelsea had "minimally met the conditions imposed" during the previous year. In order to assure greater efforts to improve, the Division recommended that the city provide a series of special assurances, including continuation of the 51 percent hiring rate for minorities, continuation of a 10 percent minimum goal for awarding contracts to minority businesses, and continuation of funding and staffing of a fair housing program "designed to assure equal access to housing and other City services". HUD adopted the FH & EO Division recommendations.

In 1981, the third year of SCP participation (Program Year 6), the FH & EO Division again found Chelsea's housing activities inadequate to meet the needs of minorities, and HUD awarded that year's grant with the understanding that the special assurances in the areas of minority employment, fair housing and minority contracting would remain in effect at least during the next year.

C. *Urban Development Action Grant.* Chelsea applied in 1978 for $6,794,000 in UDAG funds for development of the Chelsea Naval Hospital. Its proposal called for creation of a new residential area, rehabilitation of existing housing, restoration of an historic area, development of a 26–acre public park, the opening of the waterfront to commercial and recreational uses and the set aside of about 14 to 20 acres of land

---

**10.** Chelsea's participation in the two programs overlapped for two years, and the city then received funding only under the SCP program.

for industrial development. The residential proposal included construction of 300 luxury apartments, 570 market rate apartments and 300 subsidized housing units for the elderly. Additional elderly housing would be constructed in other neighborhoods as part of the UDAG project. [App. at 1009.] In addition, 132 low-income family housing units would be rehabilitated in a nearby neighborhood.

The FH & EO Division rated Chelsea's proposal as fair, commenting that it "minimally reduces the magnitude of the special problems of minority persons". The Division noted that there was no provision for low-income jobs, and the only low-income family housing provided was the 132 rehabilitated units.

In recommending the project for approval, the Boston Area Office noted that the housing proposed was geared toward middle and upper income persons, but that revitalization of the surrounding neighborhoods would provide expanded housing opportunities for low and moderate-income persons. In addition, the Area Office memo noted that about 300 jobs would be created by the project, many of them for lower-income persons, and another 400 jobs would be saved.[11] Finally, the memo noted that the added tax revenue generated by the project would significantly help the city to provide services to the low income and minority population. [App. at 759.]

## IV.

This factual background confirms appellants' contentions that Chelsea's actions did not always reflect a top priority concern for its minority residents. The city consist-

ently used a large portion of its federal funds for programs that were not specifically directed at minority housing needs. Despite repeated criticism from the local reviewing agencies and HUD's FH & EO Division, Chelsea did not refocus its community development program so as to emphasize new construction of low-income family housing. Similarly, the city's record on employment was largely the same at the end of the relevant grant years as it was when Chelsea began receiving federal funds in 1975. In 1975, in the six city departments receiving federal funds, Chelsea had 256 employees, only one of whom, a black, was a member of a minority group. In 1980, the city reported that ten of 389 permanent employees in all city departments were minorities. And in an affirmative action report submitted to HUD in April 1981, Chelsea stated that only six of its 375 fulltime employees were minorities. Reports to HUD, from the FH & EO Division and outside agencies, consistently complained of inadequacies in Chelsea's activities, prompting HUD to demand special assurances and impose conditions on the grant awards.

These facts, however, do not completely illumine the nature of Chelsea's assistance to its minority community. The *hiring* figures throughout the grant years, as opposed to the final employment figures in 1981, illustrate a more proportional relationship between the government's activities and Chelsea's minority population. Likewise, the amount of housing aid, other than through the Housing Improvement Program, reflects a similar proportionate relationship. We present two tables below, one showing city hiring between 1975 and 1981, and the other showing how Chelsea's total housing assistance was distributed.

**11.** Chelsea had attached to its UDAG application a letter from the president of Sweetheart Paper Products Co, which is located in Chelsea, indicating that it would relocate if the UDAG project did not go through, enabling the company to expand. The letter stated that an expansion would likely result in 300 additional jobs for a workforce consisting of "mostly minority and low income persons". [App. at 751.]

| Hiring in City Departments Receiving CDBG Funds [12] | | | |
|---|---|---|---|
| Program and Year | Total Hired | Minorities | Minority Percentage |
| Program Year 1 (June 1975–September 1976) | 22 | 3 | 13.6% |
| Program Year 2 (1976–1977) | 11 | 4 | 36.4% |
| Program Year 3 (1977–1978) | 37 | 6 | 16.2% |
| Program Year 4 (1978–1979) | 18 [13] | 2 | 11.1% |
| Program Year 5 (1979–1980) | 4–5 | 1–3 | 20% to 75% |
| Program Year 6 (1980–1981) | 0 | 0 | 0 |

Housing Assistance [14]

| Program and Year [15] | Total Assisted | Minority-assisted (HOUSEHOLDS) | Minority Percentage |
|---|---|---|---|
| CDBG 1 (1975–1976) | 211 | 7 | 3.3% |
| CDBG 2 (1976–1977) | 529 | 25 | 4.7% |
| CDBG 3 (1977–1978) | 478 | 91 | 19% |
| CDBG 4 (1978–1979) | 588 | 98 | 16.7% |
| CDBG 5 (1979–1980) | 488 | 134 | 27.5% |
| SCP 1 (1978–1979) | 333 | 76 | 22.8% |
| SCP 2 (1979–1980) | 781 | 213 | 27.3% |
| SCP 3 (1980–1981) | 690 | 147 | 21.3% |

These two tables illustrate that Chelsea was not ignoring its minority community. Plaintiffs' claims, therefore, must rest on the city's failure to do *enough* to meet its civil rights obligations, and not on the city's complete neglect of those obligations.

V.

The district court granted the city defendants' motion for summary judgment except as to plaintiffs' claim that the municipal defendants discriminated in the Housing Improvement Program. After trial, the court found that Chelsea and its officials had not violated any laws in operating that program. We are therefore governed on this appeal by two different standards. Considering the facts in the light most favorable to the plaintiffs, we must determine whether there exists a genuine issue as to any material fact relating to the alleged discrimination in employment, contracting and the general housing program, those claims dismissed on summary judgment. *Mutual Fire, Marine & Inland Insurance Co. v. Costa*, 789 F.2d 83, 85 (1st Cir.1986); *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975), *cert. denied*, 425 U.S. 904, 96 S.Ct. 1495, 47 L.Ed.2d 754 (1976). And in reviewing the merits of the district court's judgment on the HIP program, we

12. These figures are drawn largely from the district court's Findings of Fact. We departed from its chart with regard to two figures for which we concluded that defendants had shown clear error on the part of the district court. Even without these differences, however, our disposition would be the same.

13. Defendants contend that this figure should be 10, rather than 18, to reflect only permanent employees, which they claim is the basis for the hiring figures in all other years. The record materials do not allow us to make our own determination of this issue, and so we adopt the number used by the district court as not clearly erroneous.

14. These figures represent the product of our own scrutiny of the pertinent documents rather than a wholesale adoption of the district court's figures. Nevertheless, our figures are identical in most cases to those in the district court's chart.

We note that these totals include housing assistance provided under HUD's Section 8 program and similar state housing programs, as well as that provided under the CDBG program. The term "Section 8 housing" derives from section 8 of the United States Housing Act of 1937, 42 U.S.C. 1437f, authorizing HUD to provide housing assistance payments on behalf of eligible low-income tenants. *See also* 12 U.S.C. § 1701s (providing rent supplements for low-income families). In addition, our figures are for total "occupied" units assisted, rather than for total "committed" units, a separate figure in housing assistance reports filed by Chelsea.

15. Beginning in CDBG Year 2, the figures for minority housing assistance include households receiving rental subsidies under the Section 8 housing program. In CDBG Year 2, such assistance went to 8 households; in CDBG 3, it went to 44 households; in CDBG 4, it went to 71 households; in CDBG 5, it went to 122 households; in SCP 1, it went to 71 households; in SCP 2, it went to 115 households; and in SCP 3, it went to 100 households. Most of the other assistance to minority households was in the form of homeowner block grants.

must determine whether that court either erred as a matter of law or reached clearly erroneous factual conclusions leading to the wrong result. Fed.R.Civ.P. 52(a); *Anderson v. Bessemer City, N.C.*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Sweeney v. Board of Trustees*, 604 F.2d 106, 109 n. 2 (1st Cir.1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980). We also must consider whether HUD properly was dismissed from the case.

We shall address each statute and constitutional provision in turn, considering separately the issues of employment, housing and contracting discrimination.[16] Because of the number of issues and sub-issues, we think it helpful to furnish the following roadmap to our substantive discussion:

A. *Title VI Claims*
 1. Employment
  —discriminatory intent
  —discriminatory impact
 2. Housing
  —discriminatory intent
  —discriminatory impact
 3. Contracts
B. *Title VIII Claims*
 —substantive issues against Chelsea
 —private right of action against HUD
C. *Title I of the Housing and Community Development Act*
 —private right of action
D. *Constitutional Claims*

A. *Title VI*

Plaintiffs allege that the actions of Chelsea and HUD violated both Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d,

et seq., and regulations promulgated under that statute, 24 C.F.R. § 1.4. They claim that Chelsea's actions in failing to provide sufficient opportunities for minorities in employment, housing and business contracting constituted prohibited discrimination. Plaintiffs' claim against HUD is that the agency continued unconditionally to provide federal funds to Chelsea despite the city's alleged discriminatory practices.

We conclude that the district court correctly rejected plaintiffs' claims against Chelsea under Title VI. As to HUD, it cannot be found liable under Title VI for failing to take action against Chelsea if the city did not, in fact, discriminate against minorities in violation of the statute. Because we conclude that Chelsea did not violate Title VI, plaintiffs' claim against HUD also must fail.[17]

Section 601 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

To prevail with a direct claim under the statute, plaintiffs must show that defendants acted with discriminatory intent. *Guardians Ass'n v. Civil Service Commission of the City of New York*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983). Plaintiffs have not presented sufficient proof of such intent in any of the three areas of employment, housing or contracting.[18]

---

**16.** In light of our disposition of this case, we find it unnecessary to determine whether the district court erred in failing to certify it as a class action. Although we suspect that this case is appropriate for class action status, *see* 3B J. Moore & J. Kennedy, *Moore's Federal Practice* ¶ 23.40[1], at 23–285 (2d ed. 1985) ("racial discrimination suits in the civil rights field have been recognized in the great majority of cases as appropriate for treatment as class actions"), the results here would be the same even if the case had been brought as a class action.

For similar reasons, we find it unnecessary to discuss whether plaintiffs carried their burden

of proof on standing as to the claims against HUD. *See NAACP v. Harris*, 607 F.2d 514, 526 (1st Cir.1979).

**17.** We therefore choose not to decide the more difficult question of whether a private cause of action exists under Title VI against a federal agency, and our discussion below focuses only on the city's Title VI liability.

**18.** We also address below the issue of discriminatory impact as a violation of Title VI regulations for each of these categories.

■ 1. *Employment.* Plaintiffs do not significantly contest the hiring figures listed in the chart in Section IV.[19] They apparently concede that, during the six grant years at issue in this case, Chelsea hired between 16 and 18 minority persons, ranging from 11 percent to possibly 75 percent of the city's annual hires. Nevertheless, they contend that the city's employment record permits a conclusion that it intentionally discriminated against minorities. They point out that, in 1981, the final grant year under consideration, Chelsea still had only six minority employees, concentrated in the community development department. Plaintiffs argue that many of those hired during the previous years were only temporary employees or were employees who left because of discriminatory practices on the part of the city. They claim that, under *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1856–57 n. 20, 52 L.Ed.2d 396 (1977) (*Teamsters*), gross statistical disparities between the racial composition of the work force and that of the population at large can demonstrate a prima facie case of intentional racial discrimination.

We find two problems with plaintiffs' argument. First, while statistical disparity may be sufficient to establish a prima facie case of employment discrimination, "statistics 'come in infinite variety' and their usefulness or weight 'depend[s] on all of the surrounding facts and circumstances,' *Teamsters v. United States,* 431 U.S. at 340, 97 S.Ct. at 1856, and on ' "the existence of proper supportive facts and the absence of variables which would undermine the reasonableness of the inference of discrimination which is drawn" ' therefrom, *White v. City of San Diego,* 605 F.2d 455, 460 (9th Cir.1979)", *EEOC v. Federal Reserve Bank of Richmond,* 698 F.2d 633, 645 (4th Cir.1983), *rev'd on other grounds sub nom. Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). The context in which we view the statistics in this case is far different from that considered by the Supreme Court in *Teamsters,* where plaintiffs had claimed discrimination against minorities in the hiring of so-called "line drivers" for a freight company. Of 1,828 line drivers, only 8 (0.4%) were black and 5 (0.3%) were Spanish-surnamed. 431 U.S. at 337, 97 S.Ct. at 1855. This statistical evidence was bolstered with testimony of more than 40 specific instances of discrimination, which "brought the cold numbers convincingly to life". *Id.* at 338–39, 97 S.Ct. at 1856.

In contrast, in this case, the evidence beyond the statistical disparity shows that the city was, in fact, hiring significant numbers of minorities in relation to the total number of hires, and in some years the percentage of minority hires exceeded the minority percentage in the workforce. It is true that, as an affirmative action policy, the city could have hired more minorities; for example, the city could have chosen to hire only minorities. And plaintiffs may be correct that the ultimate poor statistical showing as to the number of minority employees may reflect an inhospitable working environment for them. But Chelsea is not required to adopt an affirmative action policy in order to avoid a finding of intentional discrimination under Title VI. In fact, it may be prohibited from employing affirmative action practices in the absence of a *prior* finding of discrimination. *See Wygant v. Jackson Board of Education,* —— U.S. ——, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (Powell, J., plurality opinion) ("the Court has insisted upon some showing of prior discrimination by the governmental unit involved before *allowing* limited use of racial classifications in order to remedy such discrimination") (emphasis added). And poor working conditions for Chelsea's minority employees is a matter of pure speculation on this record.

Had plaintiffs produced evidence of discrimination from minorities who had been hired during the grant years and claimed either that they were fired improperly or

---

**19.** At oral argument, plaintiffs' counsel implied that the annual hiring figures were inaccurate, but provided no basis for our rejecting the figures used by the district court.

left under duress, this would be a much different case. But when framed against the hiring percentages, the employment statistics by themselves simply do not add up to a case in which impact alone provides sufficient evidence of invidious intent. *Cf., e.g., Teamsters,* 431 U.S. at 337, 97 S.Ct. at 1855; *Gomillion v. Lightfoot,* 364 U.S. 339, 341, 81 S.Ct. 125, 127, 5 L.Ed.2d 110 (1960) (Alabama legislature changed shape of City of Tuskegee from a square into irregular twenty-eight-sided figure with effect of removing all but four or five of city's 400 black voters); *Yick Wo v. Hopkins,* 118 U.S. 356, 374, 6 S.Ct. 1064, 1073, 30 L.Ed.2d 220 (1886) (of 200 qualified Chinese applicants for running laundries, all rejected, while 80 non-Chinese permitted "to carry on the same business under similar conditions").

A second factor cautions against assuming that the statistical disparity in this case reflects discriminatory intent on the part of the city. Unlike cases where grossly disproportionate numbers logically reflect a longstanding policy of unequal treatment, *see, e.g., Teamsters,* 431 U.S. at 337, 97 S.Ct. at 1855, Chelsea's minority community first became a significant factor in the city during the years in which plaintiffs allege the city practiced intentional discrimination. In a city that is losing residents, and presumably not hiring large numbers of new employees, the fact that a quickly growing minority community is underrepresented in government employment is hardly surprising. In such a case, where hiring statistics are adequate, statistical disparity alone simply is insufficient to establish a prima facie case of intentional discrimination.

Plaintiffs also argue that they presented sufficient evidence to show that Chelsea's hiring practices had a discriminatory effect on minorities, a result that violates Title VI regulations.[20] The primary regulation effectuating the nondiscrimination provision of Title VI states:

"A recipient, in determining the types of housing, accommodations, facilities, services, financial aid, or other benefits which will be provided under any such program or activity, or the class of persons to whom, or the situations in which, such housing, accommodations, facilities, services, financial aid, or other benefits will be provided under any such program or activity, or the class of persons to be afforded an opportunity to participate in any such program or activity, may not, directly or through contractual or other arrangements, *utilize criteria or methods of administration which have the effect of* subjecting persons to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity as respect to persons of a particular race, color, or national origin." 24 C.F.R. § 1.4(b)(2)(i) (April 1985) (emphasis added).

Plaintiffs argue that, even if we find that the employment statistics are insufficient to establish a prima facie case of intentional discrimination, the numbers at least show a prima facie case of disparate impact in Chelsea's hiring practices. They rely on *Griggs v. Duke Power Co.,* 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971), in which the Supreme Court held that Title VII, 42 U.S.C. § 2000e, bars "practices, procedures, or tests neutral on their face, and even neutral in terms of intent ... if they operate to 'freeze' the status quo of prior discriminatory employment practices."

Plaintiffs' argument reflects a misapplication of disparate impact law. Claims of disparate impact usually involve *"employment practices* that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Teamsters,* 431 U.S. at 336 n. 15, 97 S.Ct. at 1854–55 n. 15 (emphasis added). Plaintiffs, however, do

---

**20.** Under the statute itself, plaintiffs must make a showing of discriminatory intent; under the regulations, plaintiffs simply must show a discriminatory impact. *Guardians Ass'n v. Civil Service Commission of the City of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983).

not challenge a specific employment practice or policy, such as a height requirement or passing score on a test, but argue generally that the statistical evidence as to Chelsea's employment record establishes discriminatory impact because few minorities work for the city. In essence, their argument must be that subjective employment decisions led to the discriminatory result of disproportionately few minority city employees.

Whether disparate impact analysis is applicable when plaintiffs do not challenge specific, objective employment criteria is a subject of dispute both within and among the circuits. The Fourth, Fifth, Seventh, Eighth and Ninth Circuits have held that the disparate impact model should not be used to evaluate subjective decisionmaking procedures. *EEOC v. Federal Reserve Bank of Richmond*, 698 F.2d 633, 639 (4th Cir.1983), *rev'd on other grounds sub nom. Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984); *Cunningham v. Housing Authority of the City of Opelousas*, 764 F.2d 1097, 1099 (5th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 530, 88 L.Ed.2d 461 (1985); *Carroll v. Sears, Roebuck & Co.*, 708 F.2d 183, 188 (5th Cir.1983); *Coates v. Johnson & Johnson*, 756 F.2d 524, 530–31 n. 4 (7th Cir.1985); *Harris v. Ford Motor Co.*, 651 F.2d 609, 611 (8th Cir.1981); *Atonio v. Wards Cove Packing Co.*, 768 F.2d 1120, 1133 (9th Cir.1985).[21] The Fifth and Ninth Circuits also have had panels decide the other way. *See Page v. U.S. Industries, Inc.*, 726 F.2d 1038, 1046 (5th Cir. 1984); *Atonio*, 768 F.2d at 1132–33 (describing Ninth Circuit conflict). Finally, the Sixth, Tenth, Eleventh and District of Columbia Circuits have found impact analysis applicable to subjective employee selection practices. *Lujan v. Franklin County Board of Education*, 766 F.2d 917, 930 n. 19 (6th Cir.1985); *Rowe v. Cleveland Pneu-*

*matic Co., Numerical Control, Inc.*, 690 F.2d 88, 93 (6th Cir.1982) (per curiam); *Hawkins v. Bounds*, 752 F.2d 500, 503 (10th Cir.1985); *Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir.1985); *Segar v. Smith*, 738 F.2d 1249, 1288 n. 34 (D.C.Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985).

This court has not yet decided on the applicability of disparate impact analysis to claims focusing on subjective, rather than objective, employment practices. In *Robinson v. Polaroid Corp.*, 732 F.2d 1010, 1015 (1st Cir.1984), pointing to the conflict in the circuits, we noted that it was "by no means clear" that claims related to subjective decisionmaking "should not be analyzed exclusively under a discriminatory treatment rather than a discriminatory impact theory." We further noted that "it may well be that neither approach is fully applicable in conventional form." *Id.* We did not decide the issue in that case, however, because we found that plaintiffs failed to establish disparate impact. *Id.*

■ We again find it unnecessary to decide whether the disparate impact model ever may be used in a case involving subjective job criteria. At least in this case, the disparate impact model is inappropriate because plaintiffs point to no specific practice—objective *or* subjective—that allegedly caused a discriminatory impact on minorities. They claim only that Chelsea employs a disproportionately low number of minorities. This is insufficient to establish a prima facie case of discrimination, even under a liberal application of the disparate impact model. *Castaneda v. Pickard*, 781 F.2d 456, 465 n. 11 (5th Cir.1986); *Mortensen v. Callaway*, 672 F.2d 822, 824 (10th Cir.1982). Without the threshold of a specific, facially-neutral procedure (or possibly, a combination of procedures, *see Grif-*

---

21. In some of these cases, courts have either dismissed the disparate impact claims or transformed them into "pattern or practice" suits, *see, e.g., Carroll v. Sears*, 708 F.2d at 190; *EEOC v. Federal Reserve*, 698 F.2d at 639, which are disparate *treatment* cases brought under Title VII that focus on systemwide discrimination rather than on discrimination against an individual job applicant, *see Teamsters*, 431 U.S. at 336 and n. 16, 97 S.Ct. at 1855 and n. 16. In effect, that is the type of claim plaintiffs made in this case when they alleged that Chelsea intentionally discriminated against minorities in its hiring.

*fin v. Carlin,* 755 F.2d at 1525), the disparate impact test is simply a stripped-down version of the discriminatory treatment test. We do not believe the Supreme Court in *Griggs* intended to set up an alternative test for finding discrimination that simply dropped the requirement of intent. Rather, the disparate impact model was created "to challenge those specific, facially-neutral practices that result in a discriminatory impact and that by their nature make intentional discrimination difficult or impossible to prove", *Atonio,* 768 F.2d at 1133. If plaintiffs' claims do not focus on a specific practice, it is impossible to apply the *Griggs* analysis, which envisions the employer rebutting a prima facie case of discrimination by showing that the practice leading to a disparate impact was justified as necessary to the employer's business, *Griggs,* 401 U.S. at 432, 91 S.Ct. at 854.[22]

Our analysis is also consistent with the language of 24 C.F.R. § 1.4, which contemplates a challenge to particular "criteria or methods of administration" that result in a discriminatory impact. As noted above, plaintiffs have not pointed to any such specific criterion or method. Moreover, following plaintiffs' argument to its logical conclusion leads to an untenable result. If Chelsea is guilty of discriminating simply because it has few minority employees, a city with no minority residents in 1970 and 22 percent minority residents in 1980, *and no city hiring during that decade,* would

be in violation of the law. In effect, discrimination law would embody a mandatory affirmative action component, including a requirement that white employees be fired to enable the hiring of minorities. We are certain that *Griggs* does not countenance such a scenario. *See Wygant,* 106 S.Ct. at 1847 (prior showing of discrimination is prerequisite for constitutional affirmative action plan).[23]

Thus, if there is to be a finding of employment discrimination in this case, it must arise either from Chelsea's intentional exclusion of minorities from consideration for city jobs, or from a facially neutral employment practice that results in the exclusion of minority applicants. In the former case, Chelsea would be required to stop basing employment decisions on race or ethnic origin. In the latter case, Chelsea would be required to stop using the objectionable employment practice. We conclude that the numbers here do not add up to a prima facie case of intentional discrimination, and note that the plaintiffs do not challenge any specific employment practice as causing a discriminatory impact. We therefore hold that plaintiffs have failed to establish a prima facie case of either discriminatory intent or impact in employment in the city of Chelsea.

2. *Housing.* The district court, which rejected entirely plaintiffs' allegations of intentional discrimination in housing, con-

---

**22.** This is not to say that, for disparate impact analysis to be applicable, it must always be the plaintiffs who point to the specific employment practice causing adverse impact. It could be that, in defense to plaintiffs' *prima facie* case of disparate *treatment,* an employer points to a specific job qualification as the explanation for the disparity. It would then be appropriate to evaluate the practice that is offered as justification for the discrimination under the disparate impact model. *See Segar v. Smith,* 738 F.2d 1249, 1270–72 (D.C.Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985).

**23.** A further complication of using a disparate impact analysis in this case would arise with regard to the conflicting statistics on hiring and employment. The chart in Section IV shows no disparate impact in hiring. Yet the ultimate employment record shows a disproportionately

low number of minorities as city employees at the end of the years under scrutiny here. Would a disparate impact analysis in this context ignore the hiring figures and focus on the employment ones? Or would the showing of disparate impact in employment be rebutted by the statistics on hiring? We doubt the latter, since the discriminatory practices could be taking place *after* the initial hiring decisions.

This statistical conflict between those hired and those employed would not present a puzzle if plaintiffs had alleged an appropriate disparate impact claim. Plaintiffs could be unsuccessful in arguing that a specific *hiring* practice produced a discriminatory impact, but also could be successful in establishing a case of discriminatory impact based on a supposedly neutral employment *retention* practice that had led to significantly more minority employees leaving their jobs.

cluded that the only housing program that prima facie showed evidence of discriminatory impact was the Mayor's Housing Improvement Program (HIP). At trial, however, the court concluded that defendants provided adequate justification for the HIP. Plaintiffs challenge all of the district court's findings with regard to Chelsea's housing programs.

**a. *Intentional Discrimination.*** We agree with the district court that plaintiffs have failed to establish a prima facie case of intentional discrimination in housing. Although the housing chart that appears in Section IV of this opinion shows very low percentages for minority housing assistance for the first two years of CDBG funding, in 1975–76 and 1976–77, these were the very years in which the Hispanic community in Chelsea was growing to substantial size, and it was before the city confirmed that growth with its 1978 community survey. We think it significant that, beginning with the third CDBG program year in 1977–78, Chelsea provided housing assistance to minorities roughly in proportion to their representation in the city.

In challenging Chelsea's overall housing assistance, plaintiffs emphasize that the HIP, a centerpiece of the city's CDBG program, primarily assisted homeowners, and that few of Chelsea's minority residents owned homes. Although the HIP program thus offered little direct assistance to Chelsea's minority community, this fact alone does not establish a case of intentional discrimination in a city where rental households comprised 73.3% of *all* households— not just those of minorities. *See supra* at 777. Thus, nearly three-fourths of the city's residents, including most whites, were excluded from direct participation in the HIP program. Moreover, Chelsea has a high proportion of multi-family housing; in 1978, only 725 of its 3500 housing units were single-family structures. In Chelsea, therefore, the decision to assist owner-occupied units would, in all likelihood, have resulted in assistance to large numbers of renters. Finally, as noted above, minority

households received significant assistance from the city outside of the HIP program. Although some of this aid was in the form of Section 8 rental subsidies and state funded housing programs, and not through the CDBG funding, the funding source is not important for determining whether plaintiffs have made out a case of intentional discrimination. Rather, the fact that representative numbers of minorities received housing aid undermines the notion that Chelsea conducted its housing affairs so as to *intentionally* exclude minorities from benefits.

It is worth noting the difference between this case and most of those in which courts have found housing discrimination. Plaintiffs here do not allege that they were denied particular public housing because of their race or that they were concentrated in racially segregated housing, *see Young v. Pierce*, 544 F.Supp. 1010, 1012 (E.D.Tex. 1982); they do not argue that a low-income housing project was blocked on discriminatory grounds, *see United States v. City of Birmingham, Mich.*, 727 F.2d 560, 563 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); they do not argue that public housing for minorities was less well constructed and maintained than for white residents, *see Clients' Council v. Pierce*, 711 F.2d 1406, 1408 (8th Cir.1983); they do not argue that the city pushed minorities out of Chelsea by removing the low-income housing that was previously available, *see Garrett v. City of Hamtramck*, 503 F.2d 1236, 1241 (6th Cir.1974) (urban renewal of low income housing and failure to replace with other low-income housing alleged as a program of "Negro removal"); and they do not claim that Chelsea spurned federal funds to avoid building low-income housing, *see United States v. City of Parma, Ohio*, 661 F.2d 562, 575 (6th Cir.1981), *cert. denied,* 456 U.S. 1012, 102 S.Ct. 2308, 73 L.Ed.2d 1309 (1982). In short, plaintiffs allege no direct discrimination, but rather claim harm primarily because one housing program disproportionately excluded them from participation. This disparity, without any evidence of actual discriminatory intent and in the face of

significant other housing assistance, is not enough to establish intentional discrimination in housing.

As in employment, we recognize that Chelsea could have done a better job to serve its minority residents' housing needs, and the city repeatedly was urged to do so by the local reviewing agencies and by HUD's FH & EO Division. Chelsea could have shown its commitment to the minority community by, for example, establishing a priority within the HIP program for homeowners with minority tenants; or it could have, as NLSAA recommended, sought funding for a "land bank" that would have enabled the city to set aside property for construction of low-income family housing. Such steps would have been consistent with the suggestion in a Title VI regulation that federal funding recipients "should take affirmative action to overcome the effects of conditions which resulted in limiting participation by persons of a particular race ...," 24 C.F.R. § 1.4(b)(6)(ii). Nevertheless, the failure to take such steps is not a violation of the statute, and certainly is not equivalent, in this factual context, to an act of intentional discrimination.

■ b. *Discriminatory Impact.* We thus turn to the question of the HIP program's discriminatory impact. To establish an impact claim, plaintiffs need to show that neutral "criteria or methods of administration", 24 C.F.R. § 1.4(b)(2)(i), resulted in the disproportionate exclusion of minorities from participation in the contested program. There are two potential discriminatory impact claims with regard to the HIP program. First, plaintiffs could argue that a neutral procedure *within* the HIP program disproportionately excluded minorities from participating in that particular program. There is no such allegation here; indeed, it appears that minority homeowners received their proportional, though small, share of HIP funds. *Cf. NAACP v. Harris,* 567 F.Supp. 637, 642 (D.Mass.1983) (allegation that Boston city programs designed to provide financial aid to homeowners administered in such a way as to

have discriminatory impact adverse to minorities).

The second impact claim, which plaintiffs did make, is that the choice of a program for which the basic criterion was homeownership disproportionately excluded minorities because few of them owned homes. In essence, this is a claim that minorities were largely closed off from housing assistance because their housing needs were not of the type addressed by the HIP program. It is true that the requirement of homeownership is the type of neutral criterion that often results in disparate impact on minorities. The flaw with this argument, however, is that the choice of the HIP program, with its homeownership requirement, did not disproportionately exclude minorities from all housing assistance. As shown by the chart in Section IV, other types of housing aid were provided, including rental assistance, for which most of Chelsea's minority residents were eligible. Although new construction of family rental units obviously would have helped minorities more than did the HIP program, Chelsea is not required to take only those actions that will be in the best interest of its minority residents; nor is it foreclosed from assisting homeowners simply because few of them are minorities. The city is simply required not to discriminate against its minority residents by intentionally excluding them from housing benefits or by offering assistance through a neutral procedure that has the effect of excluding them. In light of statistics showing that Chelsea provided housing assistance proportionately for all its residents, we conclude that plaintiffs have failed to establish a prima facie case of discriminatory impact with regard to the HIP program.

■ c. *UDAG.* Chelsea's UDAG grant is another instance in which the city chose to assist other groups rather than to focus on the housing needs of minorities, proposing 300 units for the elderly and no family units. Again, however, there is no evidence that the decision to construct subsidized housing for the elderly rather than family housing was made " 'because of,'

not merely 'in spite of,' its [alleged] adverse effects upon an identifiable group", as required for a finding of intentional discrimination, *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279, 99 S.Ct. 2282, 2296, 60 L.Ed.2d 870 (1979). Moreover, the UDAG proposal did not entirely ignore the needs of minorities. Chelsea's UDAG application indicated that the project would enable an expansion of the Sweetheart Paper Products Co., retaining 400 jobs and adding about 300 more to the local economy, a large number likely to be filled by minorities and low-income persons. In addition, the application stated that 15% of the work hours on the project would be assigned to minority workers.

We also reject plaintiffs' assertions of discriminatory impact in UDAG for reasons similar to those discussed in our earlier section on the HIP program, i.e. plaintiffs make no claim that Chelsea used discriminatory "criteria or methods of administration" in awarding benefits under the grant.

■ 3. *Contracting.* The third area of alleged discrimination is in the award of city contracts for work related to the federally funded programs. The district court found that in the first program year 1975–76, two contracts totalling $53,000, or 18.6% of the total $285,000 in contracts that year, were awarded to minority businesses. No other contracts were awarded to minorities during the relevant grant years. Plaintiffs point out that in the third program year, the City awarded nearly $2.5 million in Title I contracts, none to a minority. In the fourth year, out of 22 contracts granted, none was to a minority. And in the fifth year, of 23 contracts totalling nearly $1 million, again, none was to a minority.

As a preliminary matter, defendants argue that plaintiffs have no standing to raise the contracts issue because neither LUCHA nor the individual plaintiffs alleged in the complaint or stated in depositions that they owned, worked for, or sought to be employed by a minority business that would have been eligible for Title I contracts. In their reply brief, plaintiffs virtually concede that they do not meet the usual requirements for standing to assert a contract claim, but argue that they should be entitled to assert that claim as ancillary to their employment and housing claims.

We find it unnecessary to decide whether plaintiffs technically have standing on this issue. Even if they do, they have failed to establish a prima facie case of discrimination in the award of contracts. Plaintiffs allege solely that, other than two small contracts in the first program year, "not a single contract was awarded by Chelsea to a minority." Plaintiffs point to special conditions imposed by HUD requiring that Chelsea undertake affirmative action in providing minority contracting opportunities, but they do not even allege that minority businesses eligible for Title I contracts exist in Chelsea.[24]

Plaintiffs thus rely on statistical "disparity" as the basis for establishing a prima facie case of discrimination in contracting, but provide no information as to whether there is, in fact, a disparity between the number of minority businesses in Chelsea and the involvement of such businesses in city contracts. It is not sufficient to allege disparity between the number of minority *residents* and the number of contracts awarded to minority businesses. *See, e.g., Teamsters*, 431 U.S. at 337, 97 S.Ct. at 1855 (disparity between number of blacks working as low level truckers and "line drivers"); *Hazelwood School District v. Unit-*

---

24. We note that HUD's FH & EO Division recommended that Chelsea be advised to utilize, in its affirmative action program for minority business contracting, a list of minority contractors that HUD's Boston Area Office provided. [App. at 276.] Nevertheless, there is no indication that any eligible businesses were located in Chelsea. Thus, even if this case should have been certified as a class action, there is nothing to suggest that any minority businesses would be represented by these plaintiffs. For this reason, we do not reach the class action issue.

We also note that a 1979 FH & EO review found that Chelsea had taken acceptable affirmative action in minority entrepreneurship but that no substantial progress had been made. [App. at 531.]

*ed States*, 433 U.S. 299, 308 and n. 13, 97 S.Ct. 2736, 2741–42 and n. 13, 53 L.Ed.2d 768 (1977) ("a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market"); *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 142 (1st Cir.1985) (without evidence on racial composition of union membership pool, significance of lack of black members could not be assessed). Plaintiffs, at least, must shoulder the minimal burden of demonstrating that circumstances exist in Chelsea such that discrimination is a possible explanation for the low rate of minority contracting. In light of their failure to do so, we find no error in the district court's rejection of this claim.

### B. *Title VIII*

Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631, makes it unlawful to discriminate in the sale or rental of housing because of race, color, religion, sex or national origin. In alleging housing discrimination against Chelsea, plaintiffs rely principally upon section 3604(a), which states that it shall be unlawful:

"(a) To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny*, a dwelling to any person because of race, color, religion, sex, or national origin." (Emphasis added.)

Plaintiffs' claims against HUD also rely on section 3608(d)(5), which directs the Secretary of Housing and Urban Development to

"(5) administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter."

■ As a preliminary matter, plaintiffs and defendants disagree as to whether Title VIII embodies a standard of intent or one of impact. We need not resolve that dispute, however. Plaintiffs do not allege that the City of Chelsea's nondiscrimination obligations with regard to housing under Title VIII are any different from the city's obligations under Title VI. Because we previously have found that plaintiffs failed to establish either discriminatory impact or discriminatory intent under Title VI with regard to the HIP and UDAG projects, we conclude that Chelsea did not violate Title VIII with those programs.

■ Plaintiffs' Title VIII claim against HUD is not as easily resolved. Unlike Title VI, where HUD has no express separate obligation, Title VIII specifically charges the Secretary of Housing and Urban Development with "affirmatively" furthering the purposes of the statute. Some courts have interpreted this obligation as requiring affirmative action on the part of HUD to encourage fair housing practices or, at least, as prohibiting HUD from idly standing by while recipients engage in discriminatory practices. *See, e.g., Anderson v. City of Alpharetta, Ga.*, 737 F.2d 1530, 1537 (11th Cir.1984); *Clients' Council v. Pierce*, 711 F.2d 1406, 1425 (8th Cir.1983); *Garrett v. Hamtramck*, 503 F.2d at 1246–47; *Young v. Pierce*, 544 F.Supp. 1010, 1015 (E.D.Tex.1982). Plaintiffs argue here that HUD's failure to impose more serious sanctions against Chelsea, such as withholding funds until the city demonstrated results in assisting minorities, constitutes a violation of the federal agency's duty under 42 U.S.C. § 3608(d)(5).[25]

Defendants respond, however, that there is no private right of action against HUD under Title VIII, and that plaintiffs may challenge HUD's compliance with section 3608(d)(5) only in an action under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. Plaintiffs have not asserted an APA cause of action.[26]

---

**25.** Even if a private right of action exists against HUD under section 3604(a), which formed the basis of plaintiffs' suit against Chelsea, there would be no violation in this case because there is no underlying violation by Chelsea. *See supra* at 783. We therefore do not consider whether HUD may be sued under section 3604(a).

**26.** At oral argument, apparently for the first time in this case, plaintiffs stated that, if we find no private right of action against HUD under

Although plaintiffs cite a number of cases in which courts have considered Title VIII challenges to HUD, these cases are at best ambiguous as to whether they found a private right of action directly under the statute, or whether their review was conducted pursuant to the APA. For example, in the leading case of *Shannon v. HUD,* 436 F.2d 809 (3rd Cir.1970), the court appears to consider the case as governed by the APA. *See id.* at 818–21. *See also Anderson v. City of Alpharetta, Ga.,* 737 F.2d at 1534 (noting that courts imposing affirmative duty on HUD to further fair housing goals "have considered whether HUD's decision could be sustained under the 'abuse of discretion' standard set forth in 5 U.S.C. § 706(2)(A)"); *Munoz-Mendoza v. Pierce,* 711 F.2d 421, 422, 429 (1st Cir. 1983) ("In essence, [plaintiffs] seek judicial review of a 'final agency action,' 5 U.S.C. § 704, the decision of the Department of Housing and Urban Development (HUD) to grant $19 million to the City of Boston ..."); *Alschuler v. HUD,* 686 F.2d 472, 476, 477–78 (7th Cir.1982) (assumes claim arises under APA); *Little Earth of United Tribes, Inc. v. HUD,* 584 F.Supp. 1292, 1296 (D.Minn.1983) (same). *But see Young v. Pierce,* 544 F.Supp. at 1017–1019, 1020 (rejecting APA in favor of private right of action). At least one other court, while not mentioning the APA, also did not expressly analyze the question of a private right of action. *Clients' Council v. Pierce,* 711 F.2d at 1425 (but court cites to, *inter alia, Alschuler,* 686 F.2d at 481). *See also NAACP, Boston Chapter v. Pierce,* 624 F.Supp. 1083, 1086–87 (D.Mass.1985) (discussing cases on Title VIII private right of action).

Part of the ambiguity in this area can be attributed to decisions, such as *Shannon,*

that predated *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), in which the Supreme Court stated that the existence of an implied private right of action must be strictly determined in accordance with the following test:

"In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' ..., that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? ... Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? ... And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?" *Id.* at 78, 95 S.Ct. at 2088 (emphasis in original) (citations omitted).

In *NAACP, Boston Chapter v. Pierce,* 624 F.Supp. at 1087–1089, the district court of Massachusetts discussed the application of these four factors to section 3608(d) of Title VIII. We find that court's analysis to be thorough and persuasive, and we agree with its conclusion that there is no private right of action under section 3608(d). Of particular significance to us is the multi-faceted enforcement scheme expressly set out in the statute. First, Congress explicitly created a judicial remedy for discrimination in the sale, rental, financing or brokerage of housing as prohibited by sections 3603, 3604, 3605 and 3606 of Title VIII. 42 U.S.C. § 3612(a). Second, Title VIII pro-

---

Title VIII or the Housing and Community Development Act, *see infra,* we should analyze their claims as brought under the APA. We decline plaintiffs' invitation to consider an issue at this stage of the case that, for whatever reasons, plaintiffs chose not to raise earlier. *Johnston v. Holiday Inns, Inc.,* 595 F.2d 890, 894 (1st Cir. 1979).

Our statement in *Munoz-Mendoza v. Pierce,* 711 F.2d 421, 429 (1st Cir.1983), that "there is no

need to locate a private right of action [against HUD] given the judicial review provisions of the APA" is not to the contrary. In that case, we decided only the issue of standing and were providing guidance for the district court and parties on remand. In this instance, we choose not to prolong a case already decided on the merits by the district court by allowing plaintiffs to make an argument they consistently have spurned.

vides for the filing of complaints with the Secretary, which may lead to a civil suit by the complainant against the fund recipient if voluntary compliance is not obtained within thirty days. *Id.* at §§ 3610(a)–(d). Finally, Title VIII also provides that the Attorney General may bring suit to challenge a "pattern or practice" of discrimination. *Id.* at § 3613. In view of these provisions, it is unlikely that " 'Congress absent-mindedly forgot to mention an intended private action' " against HUD under section 3608(d). *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 20, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979), *quoting Cannon v. University of Chicago,* 441 U.S. 677, 742, 99 S.Ct. 1946, 1981, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting). We therefore hold that a remedy against HUD for failure to comply with section 3608(d) is available only pursuant to the APA. Because plaintiffs do not challenge HUD's actions under the APA, we do not discuss whether the agency violated its duty to "affirmatively" further the policies of Title VIII.[27]

### C. Title I of the Housing and Community Development Act

■ Plaintiffs' final statutory claim is brought under the nondiscrimination provision of the HCDA, 42 U.S.C. § 5309(a). As with the claim against HUD under Title VIII, we must decide, as a preliminary matter, whether plaintiffs have a private right of action under the HCDA. The nondiscrimination provisions of the HCDA and certain of its regulations are patterned after Title VI. Section 109(a) of the Act, 42 U.S.C. § 5309(a), states:

"No person in the United States shall on the ground of race, color, national origin, or sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity funded in whole or in part with funds made available under this chapter."

*See also* 24 C.F.R. § 570.601 (April 1979) (nondiscrimination regulations).

As noted above, in determining whether a federal statute that does not expressly provide for a private right of action nonetheless implicitly creates such a right, we must examine Congress' intent as evidenced through the four factors set out in *Cort v. Ash,* 422 U.S. at 78, 95 S.Ct. at 2088. The first of these is whether plaintiffs are a member of a class for whose " 'especial* benefit' " the statute was enacted, *id.* at 78, 80–82, 95 S.Ct. at 2088–90; *Cannon v. University of Chicago,* 441 U.S. at 689–94, 99 S.Ct. at 1953–56.

To answer this question we begin with the language and purpose of the statute. Like Title VI, which does provide for an implied private right of action, *Guardians Ass'n v. Civil Service Commission of the City of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), the language of the HCDA's nondiscrimination provision focuses on the individuals to be protected. This can be a significant factor in finding a private right of action. *See Cannon,* 441 U.S. at 690 and n. 13, 99 S.Ct. at 1954 and n. 13. Nevertheless, we believe the language of section 5309 cannot be viewed in isolation and must be considered as part of the context in which it appears. In contrast to Title VI, and other civil rights statutes that employ language similar to that found in section 5309(a), *see Cannon,* 441 U.S. at 690 n. 13, 99 S.Ct. at 1954–55 n. 13. Title I of the HCDA does not have as its purpose the prevention of discrimination. The Act was passed in response to Congress' concern for the "critical social, economic and environmental" conditions existing in the nation's cities, 42 U.S.C. § 5301(a). The statute's primary objective was "the development of viable urban communities", 42 U.S.C. § 5301(c).

It could be argued that section 5309(a) stands apart from this larger scope of Title I, and that that section, at least, was intended especially to benefit persons dis-

---

**27.** Our disposition makes it unnecessary for us to consider whether sovereign immunity stands as a bar to plaintiffs' suit under Title VIII.

criminated against on the basis of race, color, national origin or sex, and to provide them with a private cause of action—just like other statutes using similar language. In addition, Congress stated its intention in Title I to revitalize the nation's cities through increased housing and economic opportunities, "principally for persons of low and moderate income", 42 U.S.C. § 5301(c). Arguably, this expressed goal, combined with the explicit nondiscrimination provision, puts the low-income minority community at the center of Title I's embrace.

Although we acknowledge the importance of plaintiffs' interests, we do not believe Title I was enacted for their "especial benefit" in the sense required for finding a private right of action. Congress' goal was to create better cities for everyone, and improving conditions for those at the lower end of the economic scale was only one means, albeit a significant one, of achieving that goal. It is worth noting that the statute in its current form provides that maximum priority should be given "to activities which will benefit low- and moderate-income families *or* aid in the prevention or elimination of slums or blight," 42 U.S.C. § 5304(b)(3) (emphasis added), alternatives that reflect Congress' primary goal of viable cities and its recognition that this goal could be achieved in more than one way. There is no suggestion that the minority community stands in a special position with respect to this goal.

In light of the overall purpose of the Housing and Community Development Act, we think it likely that the language of section 5309(a) reflects generally the requirement that federal fund recipients not discriminate, rather than an intent to benefit a special class. By the time the HCDA was passed, the language adopted for section 5309(a) was, in effect, boilerplate nondiscrimination language, and we thus attribute little to the choice of form. *Cf. Cannon,* 441 U.S. at 693 n. 14, 99 S.Ct. at 1955–56 n. 14 (observing that Congress passed over a significantly different version of Title IX that was phrased as a simple directive to HEW). The central

question here is not simply who would benefit from the statute, "but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club,* 451 U.S. 287, 294, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981). The language and purpose of Title I do not point to such an intention.

Moreover, in considering both the legislative history and the statutory enforcement scheme as a whole, *see Cort,* 422 U.S. at 78, 95 S.Ct. at 2088, the available evidence indicates that Congress did not intend to create a mini-Civil Rights law, with its own private right of action, within the HCDA. Section 5309(b) specifically provides for enforcement by the Secretary of Housing and Urban Development, who may work through the state governor, refer the matter to the Attorney General for civil action, or take other action including the termination or reduction of funding. In addition to this explicit enforcement procedure, Congress required CDBG applicants to certify compliance with Titles VI and VIII. 42 U.S.C. § 5304(a)(5). Moreover, section 5309 was not even a part of the original Senate bill; it arose from a House amendment. Conf.Rep. No. 1279, Joint Explanatory Statement, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Ad. News 4273, 4449, 4460. We have been directed to nothing suggesting that the House addition was meant to add a significant new right to the statute.

We thus suspect that Congress expected that Titles VI and VIII would provide the primary obligations with regard to nondiscrimination, and that the main purpose of section 5309(a) was the practical one of specifying HUD's role, under the HCDA, in enforcing the requirement that federal fund recipients not discriminate. We note, moreover, that denying a private right of action under HCDA's nondiscrimination provision does little to limit an individual's ability to challenge discriminatory practices; as in this case, Titles VI and VIII may still be used to challenge any action of discrimination by recipients of HCDA funds.

The fourth *Cort* factor, whether the cause of action is one "traditionally relegated to state law", 422 U.S. at 78, 95 S.Ct. at 2088, is not applicable with respect to a federal housing statute. In light of our conclusions as to the first three *Cort* factors, therefore, we hold that Congress did not intend to create a private right of action under the HCDA. *Cf. Montgomery Improvement Association v. HUD*, 645 F.2d 291, 295–97 (5th Cir.1981).

D. *Fifth and Fourteenth Amendments*

Plaintiffs must show purposeful discrimination in order to establish a constitutional violation. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). As we have discussed at length above, they have failed to do so. We therefore affirm the district court's grant of summary judgment on plaintiffs' claims under the Fifth and Fourteenth amendments.

*In light of the foregoing discussion, the judgment of the district court is affirmed.*